**Robert H. McNEILL, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 7527.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 22, 1957.

Decided Jan. 11, 1958.

Wilton H. Wallace, Washington, D. C. (Henry F. Lerch and Wallace & Lerch, Washington, D. C., on brief), for petitioner.

Charles B. E. Freeman, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Before SOPER and HAYNSWORTH, Circuit Judges, and R. DORSEY WATKINS, District Judge.

SOPER Circuit Judge.

Robert H. McNeill, the taxpayer in this case, is a lawyer who for many years has practiced his profession in Washington, D. C. He has also been interested in real estate, and in the pursuit of this line of activity he acquired a large tract of land near Altoona, Pennsylvania, which he intended to subdivide and to sell in lots. The venture proved unsuccessful despite repeated efforts on his part and the land was finally seized and sold at a loss for taxes. The present controversy raises the question whether the taxpayer is entitled under the federal statutes to deduct the loss from his taxable income for the year 1946.

A minor question is whether the taxpayer is entitled to a deduction from in-

come in 1947 for losses in that year from bad debts due him for certain loans to individuals and certain accommodation endorsements for their benefit.

The Pennsylvania project involved 834 acres of land, a portion of which had already been divided into lots and sold. The taxpayer acquired the property at a mortgage foreclosure sale in 1924. He gave in payment his promissory notes for $12,500 and $7,500 secured by mortgage on the land. He had lost money through advances to the prior owner and hoped to recoup his loss by further subdividing and selling the land. For this purpose the land was surveyed, plats showing the division into lots were prepared, and a road was built leading to the plateau on which the land was located to make the property more accessible. The taxpayer also employed a prominent realtor in the community to solicit sales of the lots, and extensive efforts were made by advertisement and otherwise to sell the lots over a period of several years. In 1925, elaborate plans for an auction sale were made and it was well attended, but nothing was accomplished since the crowd was suddenly dispersed by a violent storm. Subsequent attempts were made to establish a public park and also to develop an airport project in the area, and efforts to interest the governmental authorities were made, but these projects also fell through. No lots were ever sold by the taxpayer, and the project lay dormant for a number of years.

Eventually, in 1940, the commissioners of Blair County, Pennsylvania, seized the property because of nonpayment of taxes and held title to it for a period of two and one-half years, during which they attempted, without success, to sell it for an amount equal to the unpaid taxes. Under Pennsylvania law the taxpayer had the right to redeem the land by payment of the taxes within certain periods (72 Purdon's Pennsylvania Statutes, §§ 5971p, 5971q and 6105.1) and he made certain efforts to sell all or part of the land but was unsuccessful. The tax authorities had no better success in their efforts to sell after the expiration of the redemption period and finally, in 1946, more than six years after the seizure, they offered to sell the property to the taxpayer for $750.00, and for this sum the property was transferred, through the intervention of the taxpayer, directly to the Royal Village Corporation, in which all of the stock was held by the taxpayer and members of his family. The transfer was made by deed on December 5, 1946, and the taxpayer accepted this as the date of the realization of his loss and deducted it in his 1946 income tax return. Six years later, in 1952, the taxpayer paid $5,250 to the estate of the mortgagee of the property in full satisfaction of the outstanding mortgage thereon at that time. The Royal Village Corporation then held title to the property.

The Commissioner disallowed the loss on the ground that the final transaction constituted an indirect sale by the taxpayer to a corporation in which more than 50 per cent in value of the outstanding stock was owned by members of his family, and hence the loss was not deductible under § 24(b) (1) (B) of the Internal Revenue Code, 1939, 26 U.S.C.A. § 24(b)(1)(B). The Tax Court affirmed this holding. Undoubtedly it was correct if the loss was realized by a sale of the property by the taxpayer to the family corporation. The statute was designed to put an end to the right of taxpayers to choose their own time for realizing tax losses on investments by intra-family transfers and other designated devices. McWilliams v. Commissioner, 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750; Commissioner of Internal Revenue v. Kohn, 4 Cir., 158 F.2d 32. The fact is, however, that the loss was not occasioned by the transfer of the property to the Royal Village Corporation. It was brought about by the seizure and sale of the property for taxes after unsuccessful efforts by the county authorities during a six-year period. Of course the true nature of the transfer rather than the form which is took is controlling, but there is nothing in the evidence to warrant the inference that

McNeill controlled the Pennsylvania authorities so that in effect the seizure and sale for taxes were his actions and not theirs, or that their subsequent attempts to sell the land were not genuine efforts to satisfy the tax lien, or that their final offer to sell the property to the taxpayer was made in collusion with him to serve his purposes. The failure of the project as a real estate development is proved by the uncontradicted evidence which covers a period of sixteen years prior to the seizure for taxes and six years thereafter, at the end of which the property was offered and sold to the taxpayer. It is quite impossible to find in this evidence the sort of conduct which characterizes family transfers made for the purpose of realizing tax losses and at the same time retaining the investments. The realization of the loss in this instance was not brought about by an arrangement between the taxpayer and the corporation which he controlled but was due to the separate and independent action of the public authorities in the collection of overdue taxes. A similar conclusion was reached under like circumstances in McCarty v. Cripe, 7 Cir., 201 F.2d 679; cf. Zacek v. Com'r, 8 T.C. 1056.

■■ There is the further question whether the loss was deductible as one incurred in the operation of the real estate business by the taxpayer or should be considered a capital loss on his investment and therefore subject to the limitations imposed upon losses of this character. The Tax Court made the finding that the taxpayer was not engaged in the real estate business during the years in issue and that the Altoona land was not held by him primarily for sale to buyers in the ordinary course of his business at the time of the tax sale in 1946. We are bound by this finding since it was not clearly erroneous. During the years immediately following the acquisition of the Pennsylvania property in 1924, the taxpayer made diligent efforts to sell the land in lots and may fairly be considered to have been engaged in the real estate business at that time; but after this period the operation ceased. The subsequent attempts to dispose of the land for a public park or an airport also came to an unsuccessful end in the late '20s or early '30s. The testimony of the taxpayer as to what he did thereafter is confined to the general statement that he tried to dispose of the property and is entirely consistent with the conclusion of the Tax Court that the project was a failure and the taxpayer did not operate it as a business in 1946, when the loss was claimed. The taxpayer supplements his testimony on this point by referring to numerous activities by him in the real estate field in various localities in or adjacent to Washington and in neighboring states, but most of these transactions took place prior to 1930 and all of them occurred many years before the tax year in question. In our judgment the tax deduction should be allowed only as a capital loss.

■ The taxpayer also made deductions in his tax return for 1947 of certain bad debts on the theory that they were business bad debts deductible under § 23(k)(1) of the Internal Revenue Code, 1939, 26 U.S.C.A. § 23(k)(1). The Commissioner disallowed the deductions as business bad debts but allowed them as non-business bad debts under § 23(k)(4) and the Tax Court sustained the Commissioner. Seven loans in the aggregate sum of $2,685 were made to five persons, three of whom were clients in or associated with the real estate business and two were office associates of the taxpayer in the practice of law. The taxpayer testified that he regarded these loans as helpful to him in his business as a practicing lawyer. The relationship of the loans, however, to the taxpayer's practice is not clearly shown and it may fairly be inferred that the moneys were advanced to aid friends of the taxpayer who for the time being were in distress. We do not think that it can be said that the Tax Court was clearly wrong in reaching the conclusion that the transactions were not related to the professional activities of the taxpayer as an

attorney but were personal in nature and therefore deductible only as nonbusiness bad debts.

The decision of the Tax Court is reversed and the case remanded for further proceedings consistent with this opinion.

Reversed.