**SOUTHERN SILK MILLS**

v.

**UNITED STATES of America.**

**Civ. A. No. 3883.**

United States District Court
E. D. Tennessee, S. D.

June 6, 1963.

438

Claunch, Shumacker & Thompson, Chattanooga, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., for defendant.

FRANK W. WILSON, District Judge.

This is a lawsuit by a taxpayer to recover certain deficiency assessments paid under the federal income tax laws for the fiscal years ending in 1956, 1957, and 1958. The only issue involved is the proper depreciation basis of depreciable property acquired by the taxpayer in 1956.

The facts are set forth fully in stipulations filed by the parties. Testimony was introduced on the trial by the taxpayer, but this testimony did not significantly add to the stipulated facts. The stipulations of fact will therefore be adopted as the findings of fact by the Court.

Merely by way of summary and to give some coherence unto the opinion without attempting to set forth in full the stipulations, it may be stated that the taxpayer, Southern Silk Mills, a textile manufacturer, in the latter part of 1955 owned all of the common stock of Southern Freezing and Preserving Company, a food processing company. A consolidated tax return was filed by Southern Silk Mills and Southern Freezing and Preserving Company in 1956 as affiliated corporations. Over a period of years Southern Freezing and Preserving Company has become indebted to Southern Silk Mills in an amount in excess of $500,000, a portion of which indebtedness was secured. In an effort to collect this indebtedness, the taxpayer initiated a lawsuit in the State Court to reduce its loans to judgment, to have the unsecured claims declared a lien, and to foreclose on the secured and unsecured claims. This court action was initiated in the latter part of 1955. The resort to a court foreclosure action, instead of a voluntary settlement between the affiliated companies, was taken to clear title to the property and to assure protection of the rights of all parties in interest, including the rights of some 300 preferred stockholders. The record reflects that good faith efforts were made to obtain an outside purchaser but these efforts were without success and Southern Silk Mills was the only bidder at the foreclosure sale on March 10, 1956, bidding in the entire assets of Southern Freezing and Preserving Company for the amount of its judgment, $517,315.63. Of this amount $476,086.22 was set up as depreciable assets and it is agreed that this is a fair market value of such assets on the date of March 10, 1956, when they were acquired by Southern Silk Mills. The basis of this property for tax depreciation purposes upon the books of Southern Freezing and Preserving Company at the time of the foreclosure was approximately $200,000 less.

The sole issue presented for decision by the Court is to establish the proper depreciation basis for federal income tax.

purposes of the depreciable assets acquired by Southern Silk Mills from Southern Freezing and Preserving Company under the undisputed facts of this case. No question is raised respecting the depreciable nature of the assets or the useful life thereof. It is the contention of the taxpayer that the proper basis for depreciation is the cost of such depreciable assets to the plaintiff at the time of the foreclosure sale. Upon the other hand, it is the contention of the Government that the assets, having been acquired by Southern Silk Mills from an affiliated company with whom a consolidated tax return had previously been filed, would require that the assets take as their basis for depreciation the same basis as they had in the hands of Southern Freezing and Preserving Company.

The general method of establishing the basis for depreciation is set forth in Sections 167, 1011, and 1012 I.R.C. (26 U.S.C.A. §§ 167, 1011, and 1012). The privilege of filing consolidated returns by affiliated corporations is provided for in Sec. 1501 I.R.C. Sec. 1502 I.R.C. provides that the Secretary of Treasury may prescribe such regulations with reference to affiliated corporations making consolidated returns as may be necessary to clearly reflect income tax liability. Treasury Regulation 1.1502–36 was promulgated in accordance with this statutory authority. After providing in subparagraph (a) of this Regulation that the basis for depreciation of property held by an affiliated corporation shall be determined in the same manner as if the corporation was not affiliated, subparagraph (b) of the Regulation provides as follows:

, "(b) *Intercompany Transactions.* The basis prescribed in paragraph (a) of this section shall not be affected by reason of a transfer during a consolidated return period, other than upon liquidation as provided in paragraph (c) of this section (whether by sale, gift, dividend, or otherwise) from a member of the affiliated group to another member of such group."

A resolution of the issue before the Court requires an interpretation of the language of the foregoing regulation. Does subsection (b) contemplate the transfer of assets from a mortgagor to a mortgagee, even though affiliated, where the transfer was accomplished by a judicial foreclosure action? The Court's attention has not been called to any judicial precedent.

It is the contention of the taxpayer that the method and proceedings by which it acquired the assets of its affiliated company, namely by court ordered foreclosure, was not such a "transfer" or intercompany transaction under Regulation 1.1502–38(b) as to prevent the property from requiring a new depreciation basis, namely the cost thereof to the plaintiff as the high bidder at the public foreclosure sale. On the other hand, it is contended by the Government that the taxpayer acquired the depreciable assets by "transfer" from an affiliated corporation, so that the tax basis of the assets for depreciation purposes would not be affected and the assets would take the same basis in the hands of the taxpayer as they had in the hands of the affiliated corporation.

In interpreting the Regulation, the taxpayer lays great stress upon the word "transfer" as limited or illustrated by the phrase "whether by sale, gift, dividend, or otherwise." It is insisted that the transfers identified in subsection (b) are *voluntary* transfers and that this connotes an intention to limit the effect of the Regulation to *voluntary* intercompany transfers. It is further the insistence of the taxpayer that a transfer accomplished by a court ordered and court conducted foreclosure would not constitute a voluntary transfer and that therefore subsection (b) would not apply.

The Court is unable to read into subparagraph (b) an intent or purpose to limit the effect of the language to voluntary transfers or to exclude transfers accomplished through mortgage foreclosures. The purpose behind subparagraph (b) is apparent. It is to prevent affiliated companies who elect to file con-

solidated returns from creating gains and losses by transfers of assets among the affiliated corporations. To exclude foreclosure actions, whether judicial or otherwise, as not being a "transfer" would provide a loophole for accomplishing that which it is apparent is intended to be prevented by the subsection.

In support of its contention, the plaintiff cites as analogous judicial authority the cases of McCarty v. Cripe, (C.A. 7) 201 F.2d 679 and McNeill v. Commissioner of Internal Revenue, (C.C.A. 4) 251 F.2d 863. Each of these cases involves an interpretation of Sec. 24(b)(1) (B) of the Internal Revenue Code of 1939 which provided that losses resulting from sales or exchanges of property, directly or indirectly, between an individual and a corporation in which the individual has more than 50% ownership will be disallowed. In each case real estate was taken from a taxpayer by public authority for non payment of real estate taxes, and thereafter a tax sale was held in which the property was repurchased by the taxpayer or a corporation in which he held more than 50% ownership. In each case the Court held that this tax sale did not constitute a direct or indirect sale so as to prevent the taxpayer from deducting the loss of his initial investment in the land. While each of these cases stresses the involuntary nature of the tax foreclosure procedure, insofar as the taxpayer was concerned, each also points out that title passed from the taxpayer to the taxing authority and from the taxing authority back to the taxpayer. In the McNeill case, the county held title six years before resale to the taxpayer. In the McCarty case, in support of its holding that there was no direct or indirect transfer from the taxpayer to the taxpayer or a corporation, the Court pointed out:

> "A tax title, from its very nature, has nothing to do with the previous chain of title; does not in any way connect itself with it. It is a breaking up of all previous titles."

The McCarty and McNeill cases are distinguishable from the principal case in two important respects, aside from the fact that they deal with different statutory language. In the first place, the sale or transfer there was a wholly involuntary action upon the taxpayer's part in that he did not initiate or control the tax foreclosure, whereas in the principal case the taxpayer initiated the foreclosure action. In the second place, and in the eyes of the Court more importantly, in the McCarty and McNeill cases a bona fide transfer of title was accomplished to an independent third party, namely the local tax authority, and a second bona fide transfer of title was accomplished from the independent third party to the taxpayer, whereas in the principal case the title was never vested in an independent third party, but rather passed from one affiliated party to another affiliated party.

In the opinion of the Court the significant language in Regulation 1.1502–38(b) is not the word "transfer" and whether it is voluntary or involuntary, but rather the phrase "transfer * * * *from a member of the affiliated group to another member of such group.*" (Emphasis added.) A good faith transfer from a member of an affiliated corporation to a third party, followed by a good faith transfer by the third party to an affiliated corporation obviously would not fall within the provisions of subparagraph (b) of the Regulation. Upon the other hand, a transfer from one member of an affiliated group to another member of the affiliated group would clearly fall within the Regulation. The voluntary or involuntary nature of the transfer would be significant only in determining whether a transfer through the medium of a third party was in good faith or was a subterfuge. The Court therefore concludes that upon the transfer of assets from Southern Freezing and Preserving Company to Southern Silk Mills, even though accomplished by a judicial foreclosure initiated by the latter as the holder of a mortgage, the assets took as their basis for depreciation under the federal income tax laws the same basis they had in the

hands of Southern Freezing and Preserving Company, since Southern Freezing and Preserving Company and Southern Silk Mills were affiliated corporations who had elected to file a consolidated tax return.

An Order will enter accordingly.