JAMES H. MERRITT, SR., AND AMANDA MERRITT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1785–65. Filed February 24, 1967.

*Donald G. Tripp*, for the petitioners.
*William L. McCulley*, for the respondent.

TIETJENS, *Judge:* Respondent determined deficiencies in the income taxes of petitioners for the taxable years 1961 and 1962 in the amounts of $3,267.42 and $3,550.69.

Some adjustments made by respondent have either been conceded or abandoned by petitioners, thus leaving three issues for our decision:

(1) Does section 267(a)(1), I.R.C. 1954, prohibit the deduction of a capital loss, and resulting capital loss carryovers, where the Internal Revenue Service seized shares of corporate stock owned by petitioner James H. Merritt and sold them at public action to his wife in the circumstances of this case?

(2) Did gains realized by petitioners in 1961 and 1962 from sales in prior years of certain lots and houses on the installment basis result from the sale of property held by them primarily for sale to customers in the ordinary course of a trade or business?

(3) Was the amount of $1,129.12 realized by petitioners on the repossession of lot 46 in the Hawthorne Heights subdivision during the taxable year 1961 ordinary income or capital gain?

FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

James H. Merritt, Sr., and Amanda Merritt (hereinafter referred to as James or Amanda individually or as petitioners) are husband and wife who now reside in Lake Worth, Fla. They filed their joint Federal income tax returns for the taxable years 1961 and 1962 with the district director of internal revenue at Detroit, Mich.

Nu-Way Supply Co., Inc. (hereinafter called Nu-Way), was organized on July 1, 1947, by acquiring the assets of a partnership composed of James, Amanda, and their two children. Upon incorporation each of the former partners received shares of stock substantially equal in total par value to his respective basis in the partnership assets. James received 4,500 shares of common stock (par $10) with a total par value of $45,000 and 9,000 shares of preferred stock (par $10) with a total value of $90,000. This represented 60 percent of the outstanding stock of each class. James had a total basis of $135,000 in his stock. In 1952 there was a stock dividend, immediately following which James exchanged some common for preferred stock so that he retained only 20 percent of the common stock. However, his basis in his Nu-Way stock, including both his preferred and common shares, remained unchanged at $135,000 until the seizure and sale of such stock in 1960 by the Internal Revenue Service.

During April 1952, the Internal Revenue Service assessed income taxes, additions to tax for fraud, and interest for the years 1944, 1945, and 1946 against James. As of July 26, 1960, these assessments remained unpaid to the extent of $9,227.68 for the year 1944, $77,769.53 for the year 1945, and $104,815.77 for the year 1946, plus interest thereon as provided by law.

On August 2, 1960, an internal revenue officer served a notice of levy on James through his attorney for the purpose of seizing and selling Nu-Way stock owned by James, thereafter to apply the proceeds to his income tax liabilities. On October 7, 1960, an internal revenue officer served a final demand on petitioner through his attorney. On October 24, 1960, James yielded his Nu-Way stock to an internal revenue officer who executed a notice of seizure and executed a receipt for the stock certificates.

On November 4, 1960, the internal revenue officer published a notice of public auction sale, listing the property to be sold on November 14, 1960, as "only the right, title and interest of J. H. Merritt, Sr." in the shares of the seized Nu-Way stock.

On November 14, 1960, these shares of Nu-Way stock were sold to Amanda for $25,000. She was the only bidder at the public auc-

tion sale. A certificate of sale of the seized property was executed by the revenue officer and given to Amanda as purchaser.

The funds for the purchase of the Nu-Way stock were borrowed by petitioners from the National Bank of Detroit. James cosigned the note evidencing the loan. Prior to the sale of the stock, the petitioners had received information from the revenue officer as to how Amanda might acquire it.

On their joint Federal income tax return for 1960 the petitioners reported a long-term capital loss from the sale of James' stock by the Internal Revenue Service to Amanda. On this return the petitioners claimed a basis in the stock of $214,500, but the parties have stipulated that the correct basis was $135,000. Since petitioners reported $9,187.49 on their 1960 tax return as short- and long-term capital gains, and also deducted $1,000 of the unabsorbed loss against other income, they claimed a long-term capital loss carryover to 1961 of $99,187.49.

Amanda began acquiring real estate in the vicinity of Utica, Mich., about 1928 when she purchased vacant land which later became the site of petitioners' home and also of Nu-Way.

In 1956 and in prior years the petitioners purchased a total of 34 lots in the Auburndale subdivision for the purpose of making a profit on resale. In 1951 and 1952 they entered into an agreement with Bruce Gibson, a builder and real estate dealer, whereby Gibson would build "starter" houses, i.e., complete houses on the outside with nothing on the inside except rough plumbing, on their Auburndale lots for a stipulated amount per house and then sell the lots for petitioners.

Prior to 1953 the petitioners purchased at least two lots in Sunset Farm subdivision. In 1953 they moved a house to these lots and invested an additional $3,662.58 in this property.

During 1953 the petitioners purchased at least three lots in the Brookland subdivision. They subsequently entered into an agreement with Otto Mass, a builder, to construct starter houses on their lots. These houses were listed for sale with C. D. MacNeil Realty before their completion.

During 1954 the petitioners purchased certain property containing 6 acres. Shortly thereafter they subdivided it into at least 11 lots, the details being handled by C. D. MacNeil Realty, and they named the property the Parkdale subdivision. They then made a contract with Otto Mass to build starter houses and listed the lots for sale with C. D. MacNeil Realty.

During 1955 and 1956 petitioners purchased at least 12 lots in Hawthorne Heights subdivision. They then built or had houses built on all of these lots.

Petitioners purchased two lots in Brookland Park No. 8 subdivision in 1952 and subsequently had Otto Mass build starter houses on them.

During 1953 they acquired three lots in Brookland Park No. 6 subdivision but made no improvements on them.

During the years 1951 through 1961 the petitioners sold the following real property on installment land contracts lasting at least 10 years, reporting the gains or profits thereon on the installment basis:

| Description | Date acquired | Date sold | Capital gain reported on collections | |
|---|---|---|---|---|
| | | | 1961 return | 1962 return |
| **1951** | | | | |
| 57½ acres,[1] Washington Township | 8/1/46 | 11/10/51 | $443.26 | $4,792.00 |
| **1952** | | | | |
| *Auburndale* | | | | |
| Lots 200 to 201 | 1944 | 4/29/52 | | |
| Lots 249 to 250 | 1942 | 8/2/52 | | |
| Lots 125 to 126 | 1944 | 11/14/52 | | |
| Starter house | 10/23/52 | 11/14/52 | | |
| Lots 196 to 197 | 1944 | 3/17/52 | | |
| Starter house | 4/7/52 | 3/17/52 | | |
| Lots 180 to 181 | 9/27/51 | 4/7/52 | | |
| Starter house | 6/17/52 | 4/7/52 | | |
| Lots 238 to 239 | 1942 | 9/25/52 | | |
| Starter house | 9/8/52 | 9/25/52 | | |
| Lots 247 to 248 | 1942 | 5/3/52 | | |
| Starter house | 7/10/52 | 5/3/52 | | |
| Lots 241 to 242 | 1942 | 9/17/52 | | |
| Starter house | 10/10/52 | 9/17/52 | | |
| Lot 236 | 1942 | 9/2/52 | | |
| Starter house | 6/20/52 | 9/2/52 | | |
| Lots 253 to 255 | 1942 | 2/15/52 | | |
| Starter house | 7/25/52 | 2/15/52 | | |
| Lots 198 to 199 | 1944 | 6/1/52 | | |
| Starter house | 7/10/52 | 6/1/52 | | |
| Lots 237 to 238 | 1942 | 9/25/52 | | |
| Starter house | 11/12/52 | 9/25/52 | | |
| **1953** | | | | |
| Lots 4 and 5, Dryden | 1947 | 6/8/53 | | |
| Lot 6, Indian Village | 1946 | 1953 | | |
| *Auburndale* | | | | |
| Lots 234 and 235 [1] | Prior year | 6/6/53 | $43.62 | $41.75 |
| Lots 243 and 244 | Prior year | 3/10/53 | | |
| Starter house | 3/26/53 | 3/10/53 | | |
| Lots 123 and 124 [1] | Prior year | 3/10/53 | 15.05 | 17.81 |
| Starter house | 3/26/53 | 3/10/53 | 87.84 | 103.91 |
| Lots 245 and 246 | Prior year | 5/25/53 | | |
| Starter house | 6/9/53 | 5/25/53 | | |
| *Sunset Farm* | | | | |
| Lots 143 and 144 | Prior year | 10/10/53 | } 18.55 | 17.64 |
| House moved thereto | Prior year | 10/10/53 | | |
| Additional costs | 10/1/53 | 10/10/53 | 24.33 | 23.14 |
| **1954** | | | | |
| *Dryden* | | | | |
| N.W. Corner Schoolhouse [1] | 1946 | 5/5/54 | $49.14 | $56.76 |
| S.E. Corner, Lot 718 [1] | 1946 | 5/5/54 | 78.27 | 89.43 |
| *Parkdale Subdivision* | | | | |
| Lot 7 and starter house | 6/21/54 | 11/4/54 | 123.76 | 841.41 |
| Lot 9 and starter house | 6/21/54 | 12/1/54 | 206.49 | 204.15 |
| Lot 5 and starter house | 6/21/54 | 12/1/54 | 133.33 | 142.16 |
| Lot 3 and starter house | 6/21/54 | 12/1/54 | 194.57 | 191.03 |

| Description | Date acquired | Date sold | Capital gain reported on collections | |
|---|---|---|---|---|
| | | | 1961 return | 1962 return |
| | | **1955** | | |
| *Brookland Park No. 12* | | | | |
| Lot 2850 | 1953 | 6/14/55 | $21.79 | $140.33 [2] (21.93) |
|     Starter house | 1955 | 6/14/55 | 125.23 | 807.72 [2] (126.02) |
| Lot 2861 | 1953 | 10/1/55 | 13.76 | 95.67 |
|     Starter house | 1955 | 10/1/55 | 93.43 | 649.33 |
| *Parkdale Subdivision* | | | | |
| Lot 1 | 6/21/54 | 3/17/55 | 26.78 | 28.43 |
|     Starter house | 1955 | 3/17/55 | 201.92 | 214.37 |
| Lot 2 | 6/21/54 | 3/16/55 | 19.00 | 17.43 |
|     Starter house | 1955 | 3/16/55 | 147.09 | 134.95 |
| Lot 14 | 6/21/54 | 7/18/55 | 8.76 | 9.30 |
|     Starter house | 1955 | 7/18/55 | 88.09 | 93.53 |
| Lot 13 | 6/21/54 | 9/16/55 | 1.64 | 12.25 |
|     Starter house | 1955 | 9/16/55 | 12.97 | 97.14 |
| *Hawthorne Heights* | | | | |
| Lot 8 and Starter house | 1955 | 7/16/55 | 151.83 | 1,544.63 |
| Lot 11 and Starter house | 1955 | 10/29/55 | 154.36 | 116.86 |
| | | **1956** | | |
| *Auburndale* | | | | |
| Lots 239-240 and Starter house | 10/11/56 | 10/11/56 | $186.95 | $143.72 |
| *Parkdale Subdivision* | | | | |
| Lot 12 | 6/21/54 | 7/13/56 | 2.80 | 21.00 |
| *Hawthorne Heights* | | | | |
| Lot 7 | | | | |
|     Starter house | 8/3/56 | 1956 | 123.25 | 154.65 |
| Lot 14 | 11/21/55 | 3/28/56 | 8.81 | 9.35 |
|     Starter house | 1956 | 3/28/56 | 83.33 | 88.48 |
| Lot 38 | 11/21/55 | 6/15/56 | 12.40 | 12.17 |
|     Starter house | 1956 | 6/15/56 | 137.35 | 134.86 |
| Lot 40 | 11/21/55 | 6/16/56 | 12.59 | 13.37 |
|     Starter house | 1956 | 6/16/56 | 135.38 | 143.73 |
| Lot 39 | 11/21/55 | 8/1/56 | 11.55 | 12.73 |
|     Starter house | 1956 | 8/1/56 | 126.58 | 139.49 |
| | | **1957** | | |
| *Brookland Park No. 12* | | | | |
| Lot 2860 | 1953 | 3/2/57 | $24.96 | $26.93 |
|     Starter house | 1957 | 3/2/57 | 153.33 | 165.42 |
| *Hawthorne Heights* | | | | |
| Lot 41 | 9/?/56 | 7/9/57 | 10.30 | 10.12 |
|     Starter house | 1957 | 7/9/57 | 95.74 | 94.06 |
| Lot 42 | 9/?/56 | 5/3/57 | 16.82 | 9.83 |
|     Starter house | 1957 | 5/3/57 | 107.31 | 62.69 |
| Lot 43 | 9/?/56 | 4/15/57 | 184.79 [2] (52.65) | ---------- |
|     Starter house | 1957 | 4/15/57 | 1,183.37 [2] (337.35) | ---------- |
| Lot 45 | 9/?/56 | 5/8/57 | (.73) | 10.69 |
|     Starter house | 1957 | 5/8/57 | (4.69) | 68.44 |
| Lot 46 | 1956 | 1957 | 1.55 | ---------- |
|     Starter house (repossessed and resold in 1961) | 1957-59 | 1957-59 | 15.98 | ---------- |

| Description | Date acquired | Date sold | Capital gain reported on collections | |
|---|---|---|---|---|
| | | | 1961 return | 1962 return |
| **1958** | | | | |
| *Parkdale Subdivision* | | | | |
| Lot 10 | 1954 | 1/1/58 | $4.89 | $5.19 |
| Starter house | 1958 | 1/1/58 | 35.97 | 36.10 |
| Lot 11 | 1954 | 4/23/58 | 12.50 | 13.26 |
| Starter house | 1958 | 4/23/58 | 76.75 | 81.49 |
| *Brookland Park No. 8* | | | | |
| Lot 2699 | 1952 | 3/29/58 | 16.02 | 17.02 |
| Starter house | 1958 | 3/29/58 | 79.62 | 84.53 |
| **1959** | | | | |
| *Brookland Park No. 8* | | | | |
| Lot 2700 and Starter house | 1952–58 | 5/19/59 | $46.97 | $57.90 |
| **1960** | | | | |
| *Brookland Park No. 6* | | | | |
| Lots 2504, 2505, 2506 | 1/7/53 | 3/31/60 | $261.68 | $270.69 |
| **1961** | | | | |
| *Hawthorne Heights* | | | | |
| Lot 46 and house (originally sold in 1957–59, re-possessed 2/25/61 and resold 9/1/61).[3] | 2/25/61 | 9/1/61 | $69.54 | $20.21 |

[1] In his statutory notice of deficiency, the respondent did not challenge the treatment of these amounts as capital gains. All other amounts above which were reported by the petitioners as capital gains were determined by the respondent to be income from the sale of property held by the petitioners primarily for sale to customers in the ordinary course of their trade or business, and hence not capital gains.

[2] Discount for cash allowed.

[3] In his statutory notice of deficiency, the respondent determined gain or profit upon repossession of this property to be $1,129.12 and that no gain or profit resulted upon its resale. Accordingly, he eliminated these items from income. Petitioners have conceded that gain or property was realized upon repossession in the amount determined by the respondent, but contend that such gain or profit was capital gain.

In 1961, the first of the 2 years in controversy, petitioners held approximately 60 installment land contracts, the payments from which were reported on the installment basis as short- and long-term capital gains, depending on the holding period of the property prior to entering into the contracts. Petitioners held these same installment land contracts in 1962.

Besides the installment land contracts, the only real estate activity in 1961 was the resale of lot 46 in the Hawthorne Heights subdivision, a lot which had been repossessed earlier that year. This lot, with improvements, had a fair market value of $9,025 on the date of its repossession and petitioners had a gain of $1,129.12 in the taxable year 1961 stemming from the repossession.

Besides the installment land contracts, the only real estate activities in 1962 were the sale of some rental property, the loss on which petitioners conceded was an ordinary loss, and the sale of their home in Florida.

Neither petitioner was ever a licensed real estate salesman or broker.

### ULTIMATE FINDINGS

All starter houses constructed on lots owned by petitioners were built for the purpose of sale. Petitioners did not expect or intend to hold the houses for investment but intended to sell them on so-called land contracts immediately upon completion or as soon thereafter as a purchaser could be found. Except for the gains on a few lots conceded by respondent to be capital gains, the installment sales of lots and houses constituted sales of property held by them primarily for sale to customers in the ordinary course of their trade or business.

### OPINION

1. *Loss on sale of stock.*—The parties agree that James was the owner of the stock sold, that his wife, Amanda, purchased the stock at the distraint sale conducted by the Internal Revenue Service pursuant to sections 6331, 6335, 6338, and 6339, and that James sustained a loss of $110,000 on the sale.

Petitioners contend that the loss sustained by James was an involuntary sale and because of this, under section 267 of the 1954 Code, was a deductible capital loss, the unused portions of which can be carried forward to subsequent years. They maintain that since the stock was seized by the Internal Revenue Service and sold at public auction, there was no sale, directly or indirectly, between related persons, and therefore the loss should not be disallowed as a deduction under section 267. Respondent, on the other hand, contends that the plain language of section 267 prohibits the deduction of the loss. He argues that there was a sale and a loss resulting therefrom and that the Internal Revenue Service merely served as a conduit for passing title to the stock, via the distraint sale, from James to Amanda. He also claims that there was a prearranged plan by petitioners that Amanda would purchase the stock seized from James.

Section 267, I.R.C. 1954, provides, in pertinent part, as follows:

(a) DEDUCTIONS DISALLOWED.—No deduction shall be allowed—

(1) LOSSES.—In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).

\* \* \* \* \* \* \*

(b) RELATIONSHIPS.—The persons referred to in subsection (a) are:

    (1) Members of a family, as defined in subsection (c) (4) ;

    \*       \*       \*       \*       \*       \*       \*

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—For purposes of determining, in applying subsection (b), the ownership of stock—

    \*       \*       \*       \*       \*       \*       \*

    (4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants ;

The forerunners of section 267(a) (1) were section 24(a) (6) of the Revenue Act of 1934 and its cognate section 24(b) (1) (A) of the Internal Revenue Code of 1939. Prior to 1934 there was a fertile field for phantom sales and exchanges with the sole purpose of creating tax losses in transactions between related individuals.

Although such pre-1934 losses were disallowed where the sales were lacking in bona fides, cf. *Charles E. Mitchell*, 32 B.T.A. 1093, revd. 89 F. 2d 873 (C.A. 2, 1937), but ultimately approved 303 U.S. 391, the problems of proof in cases involving intimate family relations presented extraordinary difficulties. Accordingly, since the property still remained within the same family group after sale, Congress determined to impose an absolute prohibition against deduction in respect of such transactions, irrespective of the bona fides of the sale. The scope of these new provisions was thoroughly considered by the Supreme Court in *McWilliams* v. *Commissioner*, 331 U.S. 694 (1947), which emphasized their broad sweep.

The Supreme Court clearly stated that the statutory language in the question provides "an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups," and in the sentence following the foregoing quotation, stated that "The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests." The Court continued (p. 699) :

It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually, in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions.

The pertinent legislative history lends support to this inference. The Congressional Committees, in reporting the provisions enacted in 1934, merely stated that "the practice of creating losses through transactions between members of a family and close corporations has been frequently utilized for avoiding the income tax," and that these provisions were proposed to "deny losses to be taken in the case of [such] sales" and "to close this loophole of tax avoidance.[13] Similar language was used in reporting the 1937 provisions.[14] Chairman Doughton of the Ways and Means Committee, in explaining the 1937 provisions to the House, spoke of "the artificial taking and establishment of losses where property was shuffled back and forth between various legal entities owned by the same persons or person," and stated that "these transactions seem to occur

at moments remarkably opportune to the real party in interest in reducing his tax liability but, at the same time allowing him to keep substantial control of the assets being traded or exchanged." [15]

We conclude that the purpose of § 24(b) was to put an end to the right of taxpayers to choose, by intra-family transfers and other designated devices, their own time for realizing tax losses on investments which, for most practical purposes, are continued uninterrupted.

We are clear as to this purpose, too, that its effectuation obviously had to be made *independent of the manner in which an intra-group transfer was accomplished.* * * *

[Emphasis supplied. Footnotes omitted.]

On the face of the statute and the problem to which it directed itself the underlying purpose of the Congress was to close a loophole through which taxpayers could obtain a loss in situations where by reason of close family ties they suffered no actual economic loss. The timing of a transaction, while a necessary factor in the taking of any loss, is really of little or no consequence in the situation which Congress was seeking to eradicate. The parties are generally free to fix the time of the loss by choosing the year of disposition. The statute in question put no restraints upon such a practice. What it clearly did by its terms and by the interpretation taken of it in *McWilliams* v. *Commissioner, supra*, was to prohibit losses from "sales * * * of property, directly or indirectly, * * * Between members of a family," including, as in this case, the taxpayer's spouse.

Here the sale was accomplished by the Internal Revenue seizing certain shares of stock owned by petitioner and selling them at public auction. His wife, by her own volition, was the purchaser. Moreover, if thought to be important, the present record sustains the view that the Merritts had prearranged to have the transaction concluded as it did, notwithstanding the fact that it was a sale of property which had been levied upon. They were able to arrange joint financing for the purchase of the stock at the sale and the wife was aided in being the purchaser by the fact that the stock was in a family corporation, the business and financial details of which were little known to any other likely bidder. This has no more indirection to it than did the sale in *McWilliams* v. *Commissioner, supra*, where "In each instance petitioner would give his broker an order by phone to sell for his or his wife's, or his mother's account a certain number of shares of a particular stock at market and, at the same time, would instruct the broker thereafter to purchase at as nearly the same price as possible a like number of shares of the same stock for the account of one of the others." (*John P. McWilliams*, 5 T.C. 623, 624.) No one contends in the case at bar that the Internal Revenue ever had title to this stock; indeed, it took pains to dispose only of the right possessed by the petitioner in the stock. In effect it acted only as his agent.

Viewed in any light, what happened here was that the family unit satisfied part of the husband's debt with jointly borrowed money and.

ended up retaining ownership of the very same stock which the husband had owned, now in the wife's name. Quaere: How could this result in a deductible loss under section 267? We think it could not.

The petitioner would have us declare that section 267 has no application where the sale, as here, was, in a sense, compulsory. We are unable to accept such a view in the light of the teachings of *McWilliams* v. *Commissioner*, *supra*. We further note that the Supreme Court in *Helvering* v. *Hammel*, 311 U.S. 504 (1941), had no difficulty in concluding that a "sale" included a forced sheriff's sale in a statute allowing a loss deduction from the sales of capital assets, limited to capital gains plus $2,000. Here, as was the case with the Supreme Court in *Helvering* v. *Hammel*, *supra* at 510, 511:

> We can find no basis in the language of the Act, its purpose or its legislative history, for saying that losses from sales of capital assets under the 1934 Act, more than its predecessors, were to be treated any differently whether they resulted from forced sales or voluntary sales. True, courts in the interpretation of a statute have some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results, *United States* v. *Katz*, 271 U.S. 354, 362, or would thwart the obvious purpose of the statute, *Haggar Co.* v. *Helvering*, 308 U.S. 389. But courts are not free to reject that meaning where no such consequences follow and where, as here, it appears to be consonant with the purposes of the Act as declared by Congress and plainly disclosed by its structure.

The foregoing conclusion is consonant with and indicated by *Thomas Zacek*, 8 T.C. 1056 (1947), and *Robert H. McNeill*, 27 T.C. 899 (1957). We believe the reversal of *Robert H. McNeill* by the Court of Appeals for the Fourth Circuit, 251 F. 2d 863, certiorari denied 358 U.S. 825 (1958), and the conclusion of the Court of Appeals for the Seventh Circuit in *McCarty* v. *Cripe*, 201 F. 2d 679, which seemingly take a contrary view, failed accurately to interpret *McWilliams* v. *Commissioner*, *supra*. Moreover, the *McCarty* and *McNeill* cases, if need be, can each be distinguished by reason of the fact that the courts note that the title passed from the taxpayer to the taxing authority and then from the taxing authority to the related party. That, as we have noted, is not so in the case at bar. In *McCarty* the court also relied upon the fact that there was spirited public bidding, a factor absent here. For emphasis, we point out again that the statute with which we are dealing by its terms disallows losses from sales of property, directly or indirectly, between spouses. The language is clear. It is broad. Its operation does not depend upon whether the sale is a sham, or lacks bona fides, or is involuntary or is a forced or a judicial sale. All the statute requires is that the loss result from a sale, directly or indirectly, between spouses. We are certainly dealing here with just such a loss. Furthermore, after the sale, the ownership of the stock remained in the family group and the loss was not genuinely realized in the economic sense. Under the statute Congress did not

deem such losses "to be appropriate occasions for the allowance of deductions." *McWilliams* v. *Commissioner*, *supra*. The claimed deduction is disallowed.

2. *Gains on sales of lots and houses.*—On this issue the petitioners contend that they acquired real estate only as an investment, stressing that the lots were held for an average of 10 years before sale. They claim that starter houses were built and the lots sold individually in order to get the greatest return on their money and that all of the activities of builders and brokers on the lots were independent of them. They assert that their main purpose was to hold receivables on installment land contracts which would provide income for their retirement; that the sales of lots and starter houses were merely a liquidation to reach this end; and that they never had a primary purpose of holding their land for sale to customers in the ordinary course of a trade or business.

Section 1221(1), I.R.C. 1954, provides as follows:

SEC. 1221.  CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

In *Malat* v. *Riddell*, 383 U.S. 569 (1966), the Supreme Court held that the word "primarily," as used in section 1221(1), means "of first importance" or "principally." Here it is the respondent's contention that the properties in question were held "primarily" for sale to customers in the ordinary course of business. We agree with the respondent.

This is entirely a factual question. The same issue has been litigated many times and the courts have repeatedly emphasized that each case must be decided on its own facts. The total factual pattern controls. *Mauldin* v. *Commissioner*, 195 F. 2d 714 (C.A. 10, 1952); and *Pool* v. *Commissioner*, 251 F. 2d 233 (C.A. 9, 1957). As set forth in *Raymond Bauschard*, 31 T.C. 910, 916 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960), some helpful factors to be considered are:

The purpose for which the property was originally acquired; the activities of the seller, or those acting either with him or on his behalf, with respect to the improvement and actual disposition of the land; the frequency and continuity of sales; and the purpose for which the property was held during the taxable years.

An application of these factors convinces us that petitioners sold real estate to customers in the ordinary course of their trade or business. While some of the lots, especially those purchased before 1952,

were originally acquired for investment, others were purchased with the sole idea of developing them and selling them for profit. For example, in the Parkdale subdivision, 4 sales were made in the same year the particular lot was purchased and a starter house built; 12 sales were made in the Hawthorne Heights subdivision within 12 months of the purchase of the lots and construction of starter houses; and in 1952 and 1953, several sales were made in Auburndale before the starter houses were even completed. After 1952 there was constant improvement and disposition of the real estate which petitioners held. They contracted with MacNeil Realty in 1954 to help subdivide acreage which was subsequently called the Parkdale subdivision. They had at least 39 starter houses built between 1952 and 1958, and held about 60 installment land contracts in 1961 and 1962, having sold an average of seven pieces of real estate per year between 1952 and 1958. While petitioners claim that the realtors and contractors acted independently of them, it is clear from the record that since petitioners held legal title to the lots and starter houses, such parties were merely acting as their agents. Whatever was done by the realtors and contractors was done at the instance and for the benefit of petitioners. Thus the developing and selling activities by others must be attributed to petitioners.

Finally, petitioners argue that their primary purpose was to make investments which would provide income for them upon their retirement. They claim that they sold so many lots because they wanted to own several receivables on installment land contracts which would provide a constant source of income to them for 10 or more years. However, all this shows is that petitioners wanted to make money and that installment land contracts were an excellent mode of doing so. The mere fact that petitioners wanted a good return on their money is no answer to the question of whether their activities in earning it constituted sales to customers in the ordinary course of a trade or business or whether they were investment activities which would qualify any gains therefrom as capital gains.

Looking at the totality of the evidence presented—the purposes for which the petitioners acquired and developed the properties, the construction of starter houses on the lots, the methods used to sell the lots and houses, the frequency and pattern of sales, and the rather substantial gains realized from the sales—we have reached the conclusion that the houses were held by petitioners primarily for sale to customers in the ordinary course of their trade or business. Therefore, we hold for the respondent on this issue.

3. *Gain realized on repossession of lot and house.*—The parties agree that the petitioners realized a gain of $1,129.12 in the taxable year 1961 from the repossession of lot 46 and improvements thereon in the Hawthorne Heights subdivision. However, they disagree as to

whether the gain was a capital gain or ordinary income. Section 453 (d), I.R.C. of 1954, provides that if an installment obligation is satisfied at other than its face value "Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received." In this case the installment obligation on lot 46 in Hawthorne Heights was satisfied by petitioners' repossession and a gain of $1,129.12 resulted. As we have already indicated, the sale with respect to which the installment obligation was received was a sale by petitioners in the ordinary course of their trade or business. Hence the gain resulting from its repossession must be treated as ordinary income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

RAUM, *J.*, concurring: In view of the discussion of the legislative history in the dissenting opinion, I wish to add a few words in support of the result reached by the majority.

It is perfectly true, as shown by the legislative history, that Congress was concerned with tax avoidance and was disturbed by loss deductions claimed in connection with prearranged intrafamily sales. But Congress was also aware that no real loss is ordinarily sustained in sales between those having a "near-identity of economic interests," see *McWilliams* v. *Commissioner*, 331 U.S. 694, 699, and the statute which it enacted was one that placed an absolute prohibition upon such deductions, without regard to whether the sales might be "voluntary" or "involuntary." There is not a word in the statute which exempts "involuntary" sales, and our attention has not been directed to anything in the legislative history indicating that Congress intended to exclude involuntary sales from the prohibition. All that the legislative history discloses in this connection is that Congress was concerned about prearranged intrafamily transactions, and such concern may well have prompted it to enact the new provisions. But the underlying basis for disallowing such deductions was the absence of "economically genuine realizations of loss," *McWilliams* v. *Commissioner*, *supra* at 699—a consideration that is equally pertinent to both voluntary and involuntary sales between members of a family. Nothing in the new provisions themselves or in the cited legislative history indicates that Congress intended to fashion the statute so narrowly as to confine it to "voluntary" sales. To the contrary, the statute which it approved was formulated in sweeping terms, and uses the words "directly or indirectly" which were broadly interpreted in *McWilliams*. Had Congress intended to limit the word "sales" to voluntary sales, it would have been a simple matter to do so, and

one would have expected to find something in the legislative history so stating. Yet we have not been referred to a single word in the legislative history showing that Congress used the word "sales" in any such restrictive sense.

The Supreme Court in *McWilliams* emphasized prearrangement in a context giving an expansive reading to the statute, not a limiting one as is urged in the dissenting opinion herein. The presence of prearrangement in *McWilliams* was significant in classifying two otherwise independent sales and purchases on the stock exchange as a single sale between the spouses, thus giving broad meaning to the word "indirectly" in the statute. It would be ironic indeed if the *McWilliams* case were to be read as one requiring a restrictive reading of the statute. It seems all too clear that the reference to prearrangement in *McWilliams* was not intended in any way to narrow the scope of this legislation.

TIETJENS, PIERCE, and TANNENWALD, *JJ.*, agree with this concurring opinion.

———

DAWSON, *J.*, dissenting in part: At the outset let me emphasize that I am in accord with all the findings of fact on all issues and the opinion of Chief Judge Tietjens with respect to the second and third issues. However, as to the first issue pertaining to the claimed capital loss on the Nu-Way Supply Co. stock, I must dissent from the majority opinion of my respected colleagues.

In my judgment the majority opinion on this issue is faulty and incorrect. It misconstrues the prohibition of section 267(a)(1); it ignores with cavernous silence pertinent legislative history; it stretches the tentacles of *McWilliams* v. *Commissioner*, 331 U.S. 694 (1947), to encompass a situation neither intended nor contemplated by the Supreme Court; and it literally flies in the face of what I regard as two sound and well-reasoned opinions by Courts of Appeals for the Fourth Circuit in *McNeill* v. *Commissioner*, 251 F. 2d 863, and the Seventh Circuit in *McCarty* v. *Cripe*, 201 F. 2d 679. Consequently, I feel compelled to express my views on these points.

The intent of Congress is not mystifying. It is plainly revealed by the legislative explanation of section 24(a)(6) of the Revenue Act of 1934 where the House Ways and Means Committee said in H. Rept. No. 704, 73d Cong., 2d Sess., p. 23:

Experience shows that the practice of *creating losses through transactions between members of a family* and close corporations has been frequently *utilized for avoiding the income tax.* It is believed that *the proposed change will operate to close this loophole of tax avoidance.* [Emphasis supplied.]

Moreover, the discussion of section 24(a)(6) in the House of Representatives, as contained in volume 78 of the Congressional Record, was as follows:

MR. DOUGHTON OF NORTH CAROLINA. * * *

Another important change recommended by the committee relates to losses from sales or exchanges of property, directly or indirectly, between members of a family, or between an individual and a corporation. Many instances have been brought to light where *transactions of this character have taken place for the sole purpose of avoiding payment of taxes, and it is believed that the suggested change will effectively close this loophole.* [p. 2511]

> \*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

MR. SAMUEL B. HILL. * * *

We have also provided in this bill that *transfers between members of the family for the purpose of creating a loss* to be offset against ordinary income shall not be recognized for such deduction purposes. *This will meet the Mitchell tax-avoidance case.* [p. 2662]

> \*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

MR. SAMUEL B. HILL. * * *

* * * Also, since we have provided in this bill against transactions between members of the same families, whereby a man may transfer to his wife, to his daughter, his son, or father, or any member of his family in direct line of ascent or descent, *we have removed the temptation from tax dodgers who transfer securities or other property from one member of a family to another in order to deduct a capital loss against ordinary income.* [p. 2663]

[Emphasis supplied.]

Any interpretation of the statutory language "losses from sales * * * of property, directly or indirectly, * * * between" members of a family must be made against the backdrop of this very specific legislative history if we are to ascertain the true intent of Congress. Delusive exactness in a statute is oftentimes a source of fallacy. To quote Judge Learned Hand, "the duty of ascertaining the meaning of a statute is difficult enough at best, and the one certain way of missing it is by reading it literally, for words are such temperamental beings that the surest way to lose their essence is to take them at their face." It is now established beyond successful challenge that a court may seek out any reliable evidence as to legislative purpose regardless of whether the statutory language appears to be clear. *United States* v. *Amer. Trucking Assns.,* 310 U.S. 534, 543–544.

Hence, as I view the statutory language beneath the illuminating skylight of the legislative purpose, Congress did not intend to prohibit by section 267 (a) (1) loss deductions on *involuntary* sales of property by governmental bodies which result in the passing of property between related taxpayers. It only prohibits losses on those sales, directly or indirectly, prearranged or predesigned by members of the intrafamily group in which such members are able to control and time the losses. I believe this view is fortified, not negated, by the Supreme Court's opinion in *McWilliams* v. *Commissioner, supra.* The *McWilliams* case did not involve an *involuntary* sale. It only involved a *voluntary sale prearranged* by members of an intrafamily group.

The statements quoted from the *McWilliams* opinion by the majority here must be read in conjunction with the following comments:

It is clear, however, that this difficulty is one which arises out of the close relationship of the parties, and would be met *whenever, by prearrangment,* one spouse sells and another buys the same property at a common price, regardless of the mechanics of the transaction. * *. *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

We conclude that *the purpose* of § 24(b) *was to put an end to the right of tax-payers to choose,* by intra-family transfers and other designated devices, *their own time for realizing tax losses* on investments which, for most practical purposes, are continued uninterrupted.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Precisely the same difficulty may arise, however, in the case of an intra-family transfer through an individual intermediary, who, *by pre-arrangement,* buys from one spouse at the market price and a short time later sells the identical certificates to the other at the price prevailing at the time of sale. * * *
[Emphasis supplied.]

In my optic this is simply a case where the majority has fired the Gatling gun of *McWilliams* off target. This is borne out by Judge Hand's pointed observation in his dissenting opinion in *Commissioner* v. *Ickelheimer*, 132 F. 2d 660, 662 (C.A. 2, 1943), when he said, "Here we can have no doubt of the purpose, of what Congress was aiming at; * * * transactions by which, in accordance with a *preexisting design*, property passes by whatever combination of moves" from one member of a family to another. This purpose was also recognized by Circuit Judge Allen in *Commissioner* v. *McWilliams*, 158 F. 2d 637, 639 (C.A. 6, 1946), where it is stated that:

If losses from these sales are permitted to be deducted the purpose of the statute will be frustrated. *These sales were admittedly for the purpose of establishing tax losses,* and the broker was so informed. There was no other purpose in the transaction. [Emphasis supplied.]

Before the Supreme Court's decision in the *McWilliams* case, this Court held in *Thomas Zacek*, 8 T.C. 1056 (1947), that a deduction claimed by a mortgagor of his loss on an involuntary foreclosure and judicial sale of the mortgaged property to members of his family was prohibited by section 24(b)(1)(A) of the 1939 Code. It is not apparent from the *Zacek* opinion whether the legislative history of the statute was ever considered when we declared that "it is also broad enough to include involuntary sales" and reached the conclusion that "there was a sale of property indirectly between members of a family." Even then, Judges Murdock, Arnold, and Kern signaled the error in a dissenting opinion which reads as follows (8 T.C. at 1058):

The statute disallows losses from sales, directly or indirectly, between brothers. Here the petitioner did not make the sale or control it directly. It was made by the sheriff, who was in no way influenced or controlled by the petitioner. It was made to the highest bidder. This sale was not the

kind which the statute was intended to reach and is not within the letter of the statute. The loss should be allowed.

The scope and purpose of section 24(b) (now sec. 267) with respect to involuntary sales, viz, contested and adverse foreclosure proceedings, judicial sales, or tax sales, was first considered, in the light of the legislative history and the *McWilliams* decision, in the case of *McCarty* v. *Cripe, supra.* There the taxpayer owned real estate against which the county instituted proceedings to foreclose its tax liens. The land was sold by the county sheriff at public auction. The highest bidder was a trustee who had been loaned the funds on open account by the taxpayer and who conveyed the real estate to a corporation in which the taxpayer owned over 50 percent in value of the outstanding stock. In holding that the deduction of the loss was not prohibited by section 24(b)(1)(B), the Court of Appeals for the Seventh Circuit said (201 F. 2d at 682):

It is difficult to conceive that the purpose thus stated could encompass an involuntary sale or transfer. The transaction in controversy obviously was involuntary insofar as the decedent was concerned. The property was taken from him and sold by operation of law. He was without choice as to the time when the state would proceed against the property and, consequently, could not have selected the time for the realization of a taxable loss * * * There is not even a suspicion that his neglect or refusal was any part of a scheme or device having to do with the incidence of taxation.

This Court again faced the same issue in *Robert H. McNeill*, 27 T.C. 899 (1957). Adhering to our prior opinion in the *Zacek* case and attempting to distinguish *McCarty* v. *Cripe*, we disallowed the deduction of a loss realized by the taxpayer upon the seizure and sale for nonpayment of county real estate taxes to a corporation wholly owned by the taxpayer and his immediate family. The Court of Appeals for the Fourth Circuit reversed us (251 F. 2d 863), holding that the taxpayer was not precluded by the provisions of section 24(b)(1)(B) from deducting the loss since it was sustained because of the separate and independent action of the county authorities in the collection of overdue taxes. The Court of Appeals stated (251 F. 2d at 865–866):

The statute was designed to put an end to the right of taxpayers to choose their own time for realizing tax losses on investments by intra-family transfers and other designated devices. McWilliams v. Commissioner, 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750; Commissioner of Internal Revenue v. Kohn, 4 Cir., 158 F.2d 32. The fact is, however, that the loss was not occasioned by the transfer of the property to the Royal Village Corporation. It was brought about by the seizure and sale of the property for taxes after unsuccessful efforts by the county authorities during a six-year period. Of course the true nature of the transfer rather than the form which is [sic] took is controlling, but there is nothing in the evidence to warrant the inference that McNeill controlled the Pennsylvania authorities so that in effect the seizure and sale for taxes were his actions and not theirs, or that their subsequent attempts

to sell the land were not genuine efforts to satisfy the tax lien, or that their final offer to sell the property to the taxpayer was made in collusion with him to serve his purposes.

In the instant case there were outstanding Federal income tax assessments against James which dated back to 1952. These were not self-assessed taxes. They were *involuntarily* assessed against James and tax liens against all his property and rights to property were *involuntarily* filed. To collect on these assessments the Internal Revenue Service had to levy upon James' Nu-Way stock in 1960 and sell it at public auction in accordance with the provisions of sections 6331, 6335, 6338, and 6339, I.R.C. 1954. The stock was purchased by his wife, Amanda, at the public sale. Although Amanda had obtained the financing for her purchase through a note on which James was coguarantor, there was no collusion by petitioners which reflected an attempt to force the levy at that given time so as to utilize losses for tax purposes. Granted that petitioners worked together to permit family retention of the Nu-Way stock, there was clearly an involuntary sale by the Federal tax authorities, and such sale was not made by or on behalf of James. The attempt in the majority opinion to bootstrap this into a *voluntary* sale, with the Internal Revenue Service acting as James' agent in selling the stock, strains credulity. This was an *involuntary* sale pure and simple. There was no agency relationship whatsoever. James had no control over the forced sale of his stock by the Internal Revenue Service. The *control* and the *timing* about which the Supreme Court spoke in *McWilliams* v. *Commissioner, supra*, are in no way present here. Indeed, since the stock was sold at public auction, there was no certainty that petitioners would be able to retain control of all the Nu-Way stock despite their desire to do so. The sale of the stock was wholly involuntary insofar as James was concerned because he did not plan, initiate, or control the seizure, the sale, or the transfer of title. A bona fide transfer of title to the stock was accomplished by an independent third party (the Internal Revenue Service) and not by James or Amanda. Even respondent acknowledges in his brief that if the Internal Revenue Service had bid in the stock at the distraint sale, had taken title thereto, and had then sold the stock to Amanda Merritt, this case would be factually similar to the *McCarty* and *McNeill* cases. Is it of any real consequence here that title to the stock did not pass to the Government as purchaser? I think not. It was the certificate of sale issued by the Internal Revenue Service under section 6339(a) that transferred James' right, title, and interest in the stock to Amanda. This was a *direct sale* between the Internal Revenue Service and Amanda—not an *indirect sale* between James and Amanda. And surely it was not a sale prearranged by an intrafamily group for

tax avoidance. The record in this case, contrary to the statement made in the majority opinion, does not support any prearrangement.

The majority's effort to cast aside the circuit court opinions in *McCarty* and *McNeill* as failing accurately to interpret *McWilliams*, or distinguish them on the ground that the title to the property passed from the taxpayers to the taxing authorities, does not persuade me one iota. I agree with the interpretation given the *McWilliams* opinion by the Courts of Appeals and I think that passage of title is a difference without substance. What is crucially important is the *involuntary* nature of the sale.

The majority opinion also alludes to the fact that "the loss was not genuinely realized in the economic sense" and that "they suffered no actual economic loss." It is clear that if James had sold his stock to an unrelated third party for $25,000 he would have sustained an economic loss of $110,000. Does it become any less genuinely realized in the economic sense where it is involuntarily taken from him by the taxing authority and sold at the same price? Plainly James has lost separate control of and title to his stock and he and his wife are out of pocket $25,000.[1]

Looking at this entire problem from a practical standpoint, I visualize no tax-avoidance scheme by the Merritts here or, for that matter, any substantial tax windfall.

In conclusion I reiterate my belief that the opinions of the Courts of Appeals provide the right answer to this question. I agree with the appellate courts that Congress did not express, and I see no reason to suppose that it entertained, any intention to disallow losses realized through bona fide sales by Federal, State, or local taxing authorities. Under these circumstances I would hold that the loss deduction is not prohibited by the provisions of section 267(a)(1).

FORRESTER, FAY, HOYT, and SIMPSON, *JJ.*, agree with this dissent.

---

[1] If Amanda should later sell the stock for less than she paid for it at the distraint sale, the amount of her loss will be limited to the difference between $25,000 and what she receives for it. See sec. 267(d), I.R.C. 1954.