## FRANK C. DAVIS, JR., AND ESTATE OF GRACE K. DAVIS, FRANK C. DAVIS, JR., EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5984-81.    Filed January 14, 1987.

*Harlan Dodson III*, for the petitioners.
*Cynthia M. Odle-Schlechty*, for the respondent.

SCOTT, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes in the amounts and for the years as follows:

| Year ending Dec. 31— | Deficiency |
| --- | --- |
| 1974 | $24,216.15 |
| 1975 | 35,683.53 |
| 1976 | 15,740.54 |

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision (1) whether Frank C. Davis, Jr. (petitioner), received income in each of the years in issue from his limited partnership interest in Gaines Properties (Properties), a Tennessee limited partnership, because of Properties being the general partner in seven limited partnerships,[1] or was Lewis E.

---

[1]The partnerships from which petitioner is attributed income as a limited partner in Properties are: Gaines Realty Co., a Tennessee limited partnership; Walker Springs Apartments, a Tennessee limited partnership; Riverband Apartments, a Tennessee limited partner-

Gaines (Mr. Gaines), individually, the general partner in those seven limited partnerships; (2) whether petitioner is entitled to a claimed ordinary loss in 1975 of $264,976 because of the termination under section 708(b)(1)(A)[2] of the Brookwood Apartments partnership (Brookwood) in which he was a general partner by the foreclosure sale, buy-in, and subsequent resale of the Brookwood property by Third National Bank (bank), or was the sale, buy-in, and subsequent transfer to C, D & G, a Tennessee limited partnership, an indirect sale between related partnerships under section 707(b)(1)(B), requiring the loss to be disallowed or, alternatively, were the transactions a sham or contrivance to obtain a tax advantage for petitioner; and (3) whether petitioner is entitled to a bad debt deduction in 1975 for amounts accrued by Brookwood as guaranteed payments in 1973 and 1974.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Frank C. Davis, Jr., and Grace K. Davis, now deceased, husband and wife during the years in issue, filed joint Federal income tax returns for the years 1974, 1975, and 1976.

At the time they filed their petition herein, Mr. and Mrs. Davis resided in Nashville, Tennessee.

Petitioner has been an investor in real estate since World War II and a car dealer in Nashville, Tennessee, for over 25 years. Sometime prior to 1970, petitioner met Mr. Gaines through J.R. Coarsey (Mr. Coarsey). Initially he knew Mr.

---

ship; Western Greene Apartments, a Kentucky limited partnership; Capella Apartments, a Tennessee limited partnership; Sealey Apartments, a Tennessee limited partnership; and Lincoln Manor Apartments, a Tennessee limited partnership (sometimes referred to as the seven limited partnerships).

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] The parties refer to amounts of guaranteed payments which respondent determined were properly includable in petitioner Frank C. Davis, Jr.'s income in 1973 and 1974. There is nothing in the record concerning the amount of such accrued payments for 1973. The notice of deficiency for 1974 shows that respondent increased petitioner's income by $46,522 denominated as "Payments from Brookwood Apts." Since both parties apparently accepted the fact that a similar adjustment in an unspecified amount was made for 1973, even though the record contains no such showing, we will include both 1973 and 1974 in our discussion of the issue.

Gaines socially and as a customer. Before meeting Mr. Gaines, petitioner had no experience in the construction industry.

Petitioner knew that Mr. Gaines was engaged in building apartments and that he was recognized as Tennessee's or Middle Tennessee's largest home builder.

Mr. Gaines has been in the construction business approximately 40 years. He generally built residential buildings, i.e., apartments and single family houses. Mr. Gaines was successful for a number of years in building construction projects. Since the early 1970's, petitioner and Mr. Gaines have been in several business ventures together.

Mr. Gaines had no formal legal, accounting, or tax law training. In legal and accounting matters, he relied on lawyers and certified public accountants. A staff of bookkeepers kept up the day-to-day bookkeeping for Properties and the many other partnerships in which Mr. Gaines was involved. Mr. Gaines was handling approximately 10 projects, each a limited partnership, during the period 1972 through 1976, each of which was operated from the same central office at 719 Main Street, Nashville, Tennessee.

Each partnership had its own checking account and checks, and separate records were kept in the name of each partnership.

In about 1971, Mr. Gaines approached petitioner concerning his investing in a partnership known as Gaines Properties (Properties) which was set up to be an investment vehicle. Mr. Gaines planned to raise $450,000 as front money, to build and sell apartments, and generally to run the business.

On or about May 10, 1971, Properties was organized with Mr. Gaines and James P. Mather as the original general partners. Petitioner invested $50,000 in Properties and became a limited partner (approximately 12 percent). Properties was one of the partnerships that used the office of Gaines Home Builders at 719 Main Street, Nashville, Tennessee. Mr. Gaines managed Properties and made most of its day-to-day business decisions. The Properties partners did not have regular meetings regarding investment decisions and petitioner did not attend any meetings of partners

of Properties at which discussions were held concerning whether Properties would invest in particular partnerships.

Approximately once or twice a month in 1974, 1975, and 1976, petitioner went to the Main Street offices to inquire about and to request tax information with respect to his investments.

## Issue 1. General Partner

Mr. Gaines signed documents indicating that he was the general partner of the seven limited partnerships. Mr. Gaines individually filed Forms 1040X for the years 1975 and 1976 which indicated that Mr. Gaines, individually, rather than Properties, was to be considered the general partner of the seven limited partnerships in issue.

The partnership agreements of each of the seven limited partnerships contained restrictions on the assignment of the general partnership interest, including the obtaining of consent of the limited partners to the assignment of the general partnership interest.

### Gaines Realty Co.

Mr. Gaines signed a limited partnership agreement for Gaines Realty Co. (GRC) as general partner on April 13, 1971. Mr. Gaines signed as general partner an amended agreement of limited partnership for GRC on December 12, 1973. He also signed a sale leaseback agreement as general partner of GRC on December 31, 1973. As late as February 17, 1976, Mr. Gaines signed correspondence as the general partner of GRC.

### Walker Springs Apartments

The 1974 and 1976 Forms 1065 for Walker Springs Apartments (WSA) contain Schedules K-1 indicating Properties as a partner,[4] but the Schedule K-1 attached to the 1975 Form 1065 lists neither Properties nor Mr. Gaines as such. However, the limited partnership agreement of WSA was signed by Mr. Gaines as general partner on February 28, 1973, and the WSA amended certificate of limited partnership agreement was signed by Mr. Gaines as general

---

[4] The 1976 Schedule K-1 shows Properties as a general partner, but the 1974 Schedule K-1 merely shows Properties as a partner without specifying general or limited.

partner on December 31, 1973. Mr. Gaines also signed as general partner for WSA an amended agreement of limited partnership dated December 12, 1973, and signed a deed of trust note, a construction loan agreement and a lending agreement with Commerce Union Bank as general partner of WSA.

## Riverbend Apartments

The Schedules K-1 attached to the Forms 1065 of Riverbend Apartments (Riverbend) for 1974, 1975, and 1976 all indicate Properties as a partner.[5] However, the articles and certificate of limited partnership, amended agreement of limited partnership of Riverbend, and the amendment to amended certificate of limited partnership of Riverbend were all signed by Mr. Gaines, individually, as general partner.

## Western Greene Apartments

The Schedules K-1 attached to the Forms 1065 for 1976 through 1978, and 1980 through 1983 for Western Greene Apartments each indicate Properties was a general partner.[6] However, the deed of trust, limited partnership agreement, and amended certificate and agreement of limited partnership were all signed by Mr. Gaines as general partner.

## Capella Apartments

Mr. Gaines, rather than Properties, was listed as general partner on the Schedule K-1 attached to the Form 1065 of Capella Apartments for each of the years 1976[7] through 1982. Mr. Gaines also signed as general partner the limited partnership agreement for Capella Apartments on February 7, 1972.

## Sealey Apartments

On October 20, 1971, Mr. Gaines signed as general partner a certificate and agreement of limited partnership

[5]The Schedule K-1 for each of the years 1974 and 1975 does not specify whether Properties was a general or limited partner, but the 1976 Schedule K-1 shows Properties to have been a limited partner.

[6]The Schedule K-1 for the 1975 Form 1065 merely shows Properties as a partner and does not specify whether general or limited.

[7]The 1974 and 1975 Schedules K-1 do not specify whether Mr. Gaines was a general or limited partner, but merely list him as a partner.

for Sealey Apartments (Sealey) and on September 18, 1975, signed an amended certificate and agreement of limited partnership as the withdrawing general partner.

*Lincoln Manor Apartments*

The Forms 1065 for each of the years 1974 through 1978 for Lincoln Manor Apartments (Lincoln Manor) indicate Mr. Gaines rather than Properties as general partner. The certificate and articles of limited partnership for Lincoln Manor were signed on January 20, 1972, by Mr. Gaines as general partner. Mr. Gaines also signed the following as general partner of Lincoln Manor: amended certificate and agreement of limited partnership, dated January 24, 1972; deed of trust note; deed of trust; building loan agreement; "Regulatory Agreement for Limited Distribution Mortgagors under section 236 of the National Housing Act, as Amended" between Lincoln Manor and the Secretary of Housing and Urban Development (HUD); rent supplement contract; financing statement and agreement; HUD owner-architect agreement; mortgagor's certificate; mortgagor's oath to the Federal Housing Commissioner; and escrow deposit agreement.

*Gaines Properties*

No timely Forms 1065 were filed for Properties for the years 1974, 1975, and 1976. The signed Forms 1065 for Properties for each of the years 1974 through 1976 indicate Mr. Gaines, individually, as the general partner. Each of these signed Forms 1065 was dated October 31, 1977.

At the time of its organization, Properties was not qualified to get a Federal Housing Administration (FHA) loan. Mr. Gaines was qualified. Mr. Gaines' signing the partnership agreements of each of the seven limited partnerships as general partner enabled each of these partnerships to obtain FHA financing subject to the FHA regulations.

Mr. Gaines' name remained as general partner on all documents dealing with FHA loans. Under FHA regulations, a general partner was obligated to remain as such until the loan was paid off.

Mr. Gaines signed documents which purported to assign the general partnership interest to Properties. However,

petitioner, as a limited partner in Properties, never knew of the substitution of Properties for Mr. Gaines as general partner in any of the seven limited partnerships.

## Issue 2. Foreclosure Loss

Brookwood was a limited partnership in which petitioner was a general partner during the years in issue. Brookwood was originally organized on or about April 28, 1973, with Properties and Mr. Coarsey as general partners and as limited partners. The Brookwood limited partnership was formed to develop an apartment project.

In December of 1973, petitioner paid Mr. Coarsey $30,000 for Mr. Coarsey's general partnership interest in Brookwood. From December of 1973 until August 15, 1975, Mr. Coarsey maintained only a 0.01799 percent limited partnership interest in Brookwood.

At the time that petitioner bought into the Brookwood partnership, the apartment project was about one-half finished, and rent-out was expected to begin in approximately February of 1974. After petitioner became a general partner in the Brookwood partnership, he began to keep the records on Brookwood.

There was a commitment for a loan of $2,100,000 on Brookwood, which Metropolitan Life Insurance Co. committed to take over as a permanent loan from the bank. Mr. Coarsey and Mr. Gaines had signed a note to the bank for $215,000 for a construction loan on Brookwood. There was a mortgage on the Brookwood property for this $215,000 construction loan.

An unusually wet spring in 1974 slowed construction of the Brookwood project. Sometime in the latter part of 1974, the limited partners were to have made an installment payment to the partnership based on a certain amount of completion of the project. Because the apartments had not been completed to an appropriate stage, the limited partners withheld their payments.

The amended agreement of limited partnership of Brookwood obligated the general partners to advance any funds necessary to avoid foreclosure. Thus, the general partners, the limited partners, and the bank held several meetings and extensive negotiations to resolve the conflict

among the partners and complete the project. At the end of 1974, petitioner signed a note to the bank increasing the $215,000 construction loan to $675,000. This was the first and only loan for the Brookwood partnership on which petitioner was personally obligated until August of 1975.

Through the spring and early summer of 1975, there were continued discussions between the general partners and the bank about the status of Brookwood. Mr. Coarsey, though a limited partner with a very small percentage in the Brookwood partnership at that time, was heavily involved with petitioner and Mr. Gaines in the dealings with the bank.

At least as early as April 1975, plans were being made among the general partners of Brookwood, Mr. Coarsey, and the bank to change the ownership of Brookwood to petitioner, Mr. Gaines, and Mr. Coarsey and to set up the buy-out of the limited partners and the foreclosure for tax purposes. In August or September of 1975, Mr. Coarsey and petitioner paid the limited partners a total of $20,000 for their limited partnership interests in Brookwood. Petitioner paid $10,000 of this money and Mr. Coarsey paid $10,000 of this money.

Two partnership returns of income (Forms 1065) were filed in the name of Brookwood for 1975. One was for the period January 1, 1975, to August 15, 1975. The other was for the period August 15, 1975, to August 15, 1975. On the Form 1065 filed for the period August 15, 1975, to August 15, 1975, the profits ownership of the partnership was listed as 49.991 percent each for petitioner and Properties and .018 percent for Mr. Coarsey.

Although the bank advertised the Brookwood property for sale, prior to the foreclosure the bank planned to bid the property in for resale to petitioner, Mr. Gaines, and Mr. Coarsey. The sale was to be held on either August 15 or August 16, 1975, and the bank was to bid in the property under conditions which the parties to the arrangement believed would avoid a collusion suit by the limited partners against the general partners, Mr. Coarsey, and the bank.

Prior to the sale, the bank proposed to bid in the property at $350,000, leaving a deficit of $325,000 on the mortgage. The bank then proposed to lend the guarantors,

Mr. Gaines, petitioner, and Mr. Coarsey, $850,000 to be secured by first mortgages. The proceeds were to be used by the guarantors to purchase the apartment complex, pay off the deficit to the bank, pay various subcontractors, and provide working capital.

Prior to the sale, an agreement in principle was reached with the limited partners that would avoid the threatened collusion suit. The bank was thus able to bid the property in for less than the amount previously proposed.

Bank documents of September 2, 1975, show that the property was foreclosed upon on August 15, 1975. The bank bid in the property for $200,000. At that point, the bank proposed to lend $885,000 to Mr. Gaines, petitioner and Mr. Coarsey to enable them to repurchase the apartment complex.

C & D Corp. was incorporated by Mr. Coarsey and petitioner on or about September 24, 1975. C, D & G, d.b.a. Brookwood Apartments, a Tennessee limited partnership, was set up on or about September 26, 1975, with Properties and C & D Corp. as general partners and Mr. Coarsey, petitioner, and Properties as limited partners. Mr. Coarsey and petitioner each owned 32 percent, Properties owned 34 percent, and C & D Corp. owned 2 percent of C, D & G. Thus, the ownership of the capital or profits interests of C, D & G was directly or indirectly 100 percent in the same persons as the Brookwood owners immediately prior to the foreclosure. By a quitclaim deed dated September 26, 1975, the bank deeded the Brookwood property to C, D & G for $200,000.

## Issue 3. Bad Debt

The Brookwood records which would show the amount of payments petitioner received and the treatment of those payments were not produced at the trial.

In his notice of deficiency, respondent (1) determined that petitioner, a 12-percent limited partner in Properties, should include within his income certain amounts derived from the seven limited partnerships because Properties, rather than Mr. Gaines, individually, was the general partner; (2) disallowed a $264,976 claimed section 1231 ordinary loss from the August 15, 1975, disposition of Brookwood; and (3)

determined that petitioner should include in income for 1974, payments from Brookwood in the amount of $46,522.

OPINION

### Issue 1. General Partner

Respondent argues, in accordance with his determination in his notice of deficiency, that petitioner should include in his income for the years 1974 through 1976 certain amounts allocable to him as a limited partner of Properties resulting from amounts allocable to Properties as the general partner in seven partnerships.

Petitioner contends that the seven limited partnerships were validly organized with Mr. Gaines as general partner and that there was no change to Properties as the general partner during any of the years here in issue.

It is respondent's position that even though the documents creating the partnerships show Mr. Gaines as the general partner in each partnership, Properties should be considered the general partner because Mr. Gaines had, until he filed amended and delinquent returns in December of 1977, at all times represented to respondent that Properties was the general partner. Respondent recognizes that in a number of situations, Mr. Gaines indicated to the IRS that he was the general partner. As respondent points out, Mr. Gaines, who admittedly ran Properties, failed to file Forms 1065 for Properties for the years in issue, 1974 through 1976, until December of 1977. The record also shows that Mr. Gaines signed not one but three sets of returns for Properties in December of 1977 and did not know until the trial of this case which set had actually been filed.

Respondent further argues that Properties should be considered the general partner in the seven partnerships because that was the intent of the parties from the time the partnerships were formed. However, even Mr. Gaines' personal returns show an inconsistent position with respect to Properties. His initial returns for the years 1974 and 1975 show Properties as the general partner of the seven partnerships. These returns were followed by amended returns filed in December of 1977 in which Mr. Gaines

shows himself rather than Properties, as the general partner of each of the partnerships. Subsequent to these returns, Mr. Gaines again changed his position, and he now contends, for tax purposes, that Properties is the general partner of the seven limited partnerships.

In our view, the evidence does not support these arguments of respondent. Mr. Gaines' changing position as to who was the general partner has been noted above. In addition, petitioner testified that he had difficulty in obtaining information, tax or otherwise, from Mr. Gaines, that Properties' partners held no investment decision meetings, that he was not aware of Mr. Gaines' assigning his general partnership interest in the seven limited partnerships, and although he did not know exactly who the general partner was supposed to be, the partnership documents clearly showed Mr. Gaines as general partner.

Respondent's contention that petitioner and the other limited partners of Properties intended Properties to be the general partner, and so treated it, is simply not supported by the record.

As petitioner contends, the partnerships were validly organized pursuant to the laws of Tennessee and Kentucky. Each partnership was formed with Mr. Gaines, individually, as a general partner; each partnership agreement prohibited the assignment of a general partnership interest or substitution of a general partner without the consent of all limited partners. Mr. Gaines signed documents as general partner for each of the seven partnerships both before and after the date of alleged assignments. Mr. Gaines' actions with respect to the IRS both before and after the alleged assignments were and are inconsistent. Mr. Gaines represented to the FHA that he was, and would continue to be, the general partner in order to obtain FHA financing for various apartment projects. No valid assignment of the general partnership interests appears in this record.

While documents entitled "Assignment" are present in the record, the evidence does not show when they were executed and they do not show approval by the other partners. Specifically we find Mr. Gaines "assignments" to be ineffectual. To hold otherwise would violate the limited

partnership agreements and the Uniform Limited Partnership Acts as in effect in Tennessee and Kentucky.

Respondent argues the issue is obfuscated because of poor recordkeeping and documentation. However, the majority of the extensive documentary evidence stipulated to by the parties consists of documents in which Mr. Gaines, individually, represented to the public, the limited partners of the seven partnerships, the FHA, the IRS, and various commercial lending or banking institutions, among others, that he and not Properties was the general partner of the seven partnerships. We do not find plausible Mr. Gaines' explanations of why this was done, if in fact the general partnership interest had been assigned to Properties, nor do we consider Mr. Gaines' professed reliance upon his tax advisors a sufficient explanation for his inconsistent conduct.

The record shows that (1) Mr. Gaines was the original general partner of the seven limited partnerships; (2) there was no compliance with the limited partnership agreement restrictions for assigning his general partnership interest; (3) partnership documents were signed prior and subsequent to the alleged "assignments" by Mr. Gaines, individually, as general partner; and (4) Mr. Gaines, when taking a position at all, has advanced conflicting positions as to who was the general partner. We find that petitioner was not made privy to Properties' management decisions and did not receive Schedules K-1 or Forms 1065 for the partnership years here involved until Mr. Gaines filed delinquent returns in December 1977 following an IRS audit. Petitioner was the recipient of little, if any, information regarding Properties' actions, was not aware of the seven partnerships approving a general partner substitution and generally was left in the dark as to the operations of Properties in spite of repeated attempts to gain information from Mr. Gaines, who admittedly ran the operations.

Based on the evidence in this record, we hold that during the years 1974, 1975, and 1976, Mr. Gaines, individually, rather than Properties, was the general partner in the seven limited partnerships.

## Issue 2. Foreclosure Loss

Petitioner takes the position that under section 1231 he is entitled to an ordinary loss in the amount of $264,976 for 1975 because of the foreclosure on the Brookwood property. Petitioner argues that under the plain language of section 1001 he is entitled to the claimed loss deduction. Petitioner argues that there is no evidence in this record to indicate the existence of a pre-existing agreement between the bank and the general partners, and thus there was no indirect sale.

Petitioner contends that the bank took title to, and operated, the Brookwood property for a period of time. Petitioner also argues that the subsequent purchase by C, D & G from the bank involved a loan greater than the loan originally due against the property, to different borrowers, on different terms, and with considerable additional collateral required. While petitioner's testimony regarding the foreclosure sale is to the effect that the bank would seek the best deal possible on the Brookwood property, the bank's finance committee minutes indicate the existence of an agreement to resell the property to an entity formed by the partners of the entity owning the property at the time of the foreclosure sale.

As respondent points out, the bank's finance committee meeting minutes show that an agreement predating the foreclosure sale existed between the bank, the Brookwood general partners, and Mr. Coarsey. As of August 11, 1975, the bank planned to bid the property in for $350,000. This price was determined to be sufficient to avoid a collusion suit by the limited partners. The August 11, 1975, finance committee minutes stated under the heading "Current Status":

A foreclosure sale is scheduled for Friday, August 15, at which time we intend to foreclose on the property against our second mortgage. This will eliminate the problems we have all had in dealing with the limited partners in New York who have been the cause for the plan not working.

The minutes further stated under the heading "Proposed Plan":

We propose to bid the property in at $350,000 based on a letter * * * establishing this to be a fair market value * * * . This will establish a

deficiency against our guarantors of $325,000. We will then lend Davis, Gaines, and Coarsey $850,000 secured by satisfactory first mortgages to be furnished us by them * * * . Proceeds of the loan will be used to buy the apartment project from us, pay off the $325,000 deficiency, pay approximately $100,000 in subcontractor bills which the partners feel obligated to pay and provide $50,000 operating capital while the project achieves its rent-up. * * *

We find it incredible that the bank would have a proposed plan regarding a loan to Mr. Gaines, Mr. Coarsey, and petitioner in the absence of a request by those parties for such a loan.

However, before the August 15, 1975, foreclosure sale, the limited partners agreed to be bought out for $20,000. With the collusion threat eliminated, the bank bid in the property for $200,000 which, as respondent suggests, produced a greater tax advantage to petitioner.

We find the facts present in the instant case to be similar to those in *Hassen v. Commissioner*, 63 T.C. 175 (1974), affd. 599 F.2d 305 (9th Cir. 1979). While *Hassen v. Commissioner, supra*; *McWilliams v. Commissioner*, 331 U.S. 694 (1947); *McNeill v. Commissioner*, 251 F.2d 863 (4th Cir. 1958), cert. denied 358 U.S. 825 (1958); and *McCarty v. Cripe*, 201 F.2d 679 (7th Cir. 1953), deal with section 267, the legislative history to section 707(b)(1)(B)[8] indicates that the Senate Finance Committee adopted rules comparable to those in section 267 so that "losses from sales of property between two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital or profits interest are disallowed." S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 387 (1954).

Petitioner contends *McWilliams*, *McNeill*, *McCarty*, and *Hassen* require a definite agreement pre-existing the sale. However, we do not interpret those cases to require an

---

[8]Sec. 707(b) reads in pertinent part as follows:

(1) LOSSES DISALLOWED.—No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between—

*   *   *   *   *   *   *

(B) two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests.

In the case of a subsequent sale or exchange by a transferee described in this paragraph, section 267(d) shall be applicable as if the loss were disallowed under section 267(a)(1).

agreement any more specific or definite than is present in this case.

In *Hassen*, this Court disallowed under section 267(a)(1) the loss incurred on a foreclosure sale of mortgaged property as an indirect sale between the taxpayer and his closely held corporation. The taxpayer's property was subject to a mortgage to Pacific Thrift. The mortgage was in default but the taxpayer was able to obtain several extensions on foreclosure. A few days prior to the actual foreclosure, the taxpayer and a Pacific Thrift official had a discussion in 'which the Pacific Thrift official told the taxpayer that if Pacific Thrift had to foreclose and Pacific Thrift bought the property at foreclosure, it would give the taxpayer or a taxpayer-designated party the right to purchase that property for the bid-in price plus foreclosure costs. The purchase right was contingent upon the taxpayer's ability to borrow the purchase price within 90 days of foreclosure.

On May 31, 1961, the foreclosure sale took place and Pacific Thrift, the only bidder, purchased the property for an amount equal to the outstanding note balance. Five days later, June 5, 1961, Pacific Thrift and ULC, the taxpayer's closely held corporation, entered into an escrow agreement for the purchase of the property for an amount equal to the note balance plus foreclosure costs. On August 30, 1961, some 3 months following the foreclosure, ULC purchased the property from Pacific Thrift.

The taxpayer, on his 1961 return, noted the loss but did not claim it at that time because the amount was uncertain. On his 1962 return, he claimed a loss on the property which respondent disallowed.

The taxpayer contended that section 267(a)(1) was not applicable because Pacific Thrift was not in a prohibited relationship to the taxpayer and therefore the loss on the sale should be allowed. The taxpayer also contended that the subsequent sale of the property from Pacific Thrift to ULC was a separate independent transaction.

Respondent argued that the sale was in fact an indirect sale between the taxpayer and his closely held corporation, and as such, was within the provision of section 267.

Respondent also contended that the sale produced no economic loss because of the prearranged disposition.

This Court, in *Hassen*, cited *McWilliams v. Commissioner*, *supra*, as interpreting the congressional purpose of section 24(b) of the 1939 Code which was substantially the same as section 267(a)(1). That purpose was—

to effectively determine the finality of an intragroup transfer of property and to absolutely prohibit the allowance of losses on any direct or indirect sales, bona fide or otherwise, between certain specified groups which have nearly the same economic interests unless there was such a break in the group's continuity of investment that it caused the seller to realize an economic loss. Consequently, if there is a shift of property between those economically related persons designated under section 267(b), then, regardless of the motive for and manner in which the intragroup transfer is accomplished, the resulting loss is disallowed under section 267(a)(1) unless there occurs a definite break in the continuity of the related group's economic interest in the transferred property so that the seller undoubtedly realizes a genuine substantive economic loss. [*Hassen v. Commissioner*, 63 T.C. at 184.]

In *McWilliams*, one spouse directed his broker to simultaneously sell certain shares of stock for one spouse and purchase for the other spouse the same number of shares of that stock for as nearly the same price as possible. The Supreme Court held that the taxpayers' losses should be disallowed because there had been no genuine economic loss. The transaction in question amounted to an indirect sale from one to the other because their "economic interest as a whole in the transferred property had not for practical purposes been relinquished nor even diminished but retained uninterrupted and, in this economic sense, their sustained losses were not realized." *Hassen v. Commissioner*, 63 T.C. at 184.

The Court in *McWilliams* (*supra* at 699-701) noted:

Section 24(b) states an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests. It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually, in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions.

\*     \*     \*     \*     \*     \*     \*

> We conclude that the purpose of section 24(b) was to put an end to the right of taxpayers to choose, by intra-family transfers and other designated devices, their own time for realizing tax losses on investments which, for most practical purposes, are continued uninterrupted.
>
> We are clear as to this purpose, too, that its effectuation obviously had to be made independent of the manner in which an intra-group transfer was accomplished. * * *
>
> [Fn. ref. omitted.]

This Court reasoned in the *Hassen* case that whether there was an "indirect" sale between the taxpayers and U.L.C. depended upon whether the purchase by U.L.C. was so related to the sale by the taxpayers "that the economic interest of each of the specified groups, * * * , continued for most practical purposes uninterrupted so that neither group's sustained loss was a realized loss in the economic sense." *Hassen v. Commissioner, supra* at 185-186.

Where property was purchased at foreclosure with an understanding that the seller be given a right to repurchase for the note balance plus foreclosure costs and the purchaser did subsequently reconvey that property to a taxpayer-related entity, there was not sufficient economic realization to allow the loss to be deducted. This Court stated:

> At the time of the foreclosure sale petitioners did not anticipate that they would lose their economic interest in [the property] but rather contemplated by virtue of the prearranged understanding that they would retain their interest. Their reasonable expectations were subsequently fulfilled; consequently, their economic wealth was not reduced but merely relocated and their purported losses were not genuine losses in the economic sense but wholly illusory ones. [*Hassen v. Commissioner, supra* at 187; citations omitted.]

Petitioner here, as did the taxpayers in *Hassen*, argues that the sale is not indirect, relying on *NcNeill v. Commissioner, supra*, and *McCarty v. Commissioner, supra*. The Fourth Circuit in *McNeill* reversed this Court which had disallowed the taxpayer's loss as an indirect sale. The taxpayer's property had been seized for nonpayment of taxes by the Pennsylvania authorities. The taxpayer deducted a loss in the year of seizure. For more than 6 years, the State unsuccessfully attempted to sell the property. Thereafter, the property was sold to a corporation, all the stock of which was held by the taxpayer or his family. The

Fourth Circuit, noting the loss did not arise from the transfer to the taxpayer's corporation but from the seizure for taxes, stated:

Of course the true natue of the transfer rather than the form which it took is controlling, but there is nothing in the evidence to warrant the inference that McNeill controlled the Pennsylvania authorities so that in effect the seizure and sale for taxes were his actions and not theirs, or that their subsequent attempts to sell the land were not genuine efforts to satisfy the tax lien, or that their final offer to sell the property to the taxpayer was made in collusion with him to serve his purposes. * * * The realization of the loss in this instance was not brought about by an arrangement between the taxpayer and the corporation which he controlled but was due to the separate and independent action of the public authorities in the collection of overdue taxes. * * * [*McNeill v. Commissioner, supra* at 865-866.]

In the *Hassen* case, this Court distinguished *McNeill* on the fact that in *McNeill* "there was not any arrangement whereby the taxpayer or his controlled corporation could reasonably expect to retain the investment in the land." *Hassen v. Commissioner, supra* at 187. There was lacking that nexus between the sale by the taxpayer and the purchase by his controlled corporation which is present both in *Hassen* and here to show the existence of an indirect sale.

In *McCarty v. Cripe, supra*, the taxpayer's land was also seized for nonpayment of taxes. The land was subsequently sold at auction to the highest bidder who purchased with money provided by the taxpayer. The purchaser then sold the land to the taxpayer's controlled corporation. The Seventh Circuit declined to find an indirect sale, concluding that there was no prearrangement but rather a purchase at public auction among some 25 bidders. In *Hassen*, we distinguished *McCarty* also on the basis that it involved no prearrangement whereby the taxpayer was to retain his investment.

Petitioner, as did the taxpayer in *Hassen* with respect to section 267(a)(1), would attempt to construe section 707(b)(1)(B) to read out of it any indirect sales. We reiterate the statement in *Hassen v. Commissioner, supra* at 190:

In our view for an "indirect" sale to occur within the meaning of section 267(a)(1), it is not necessary that there be a single integrated transaction which transfers property between specified persons. To require that the

several steps, which are taken with respect to the transfer of property between specified persons, must be considered as parts of a single integrated transaction for there to be an "indirect" sale would in effect limit the disallowance provisions of the statute only to "direct" sales. * * *

The essentials of an "indirect" sale within the meaning of section 267(a)(1) are that the sale by one person and the purchase by another specified under the statute are so related to one another that the seller does not realize a genuine economic loss. In determining whether there is in fact such an economic loss, the intent of the parties, the time element, the ultimate result, and the mutual interdependence of the steps taken as well as the selling price, the fair market value, and the near-identity of terms of the sale and purchase are among the factors to be considered. However, it is not essential that the sale and purchase be considered a single transaction for there to be an "indirect" sale within the meaning of section 267(a)(1).

Under the facts in this case, we find that the sale by Brookwood and the purchase by C, D & G produced no genuine economic loss. The intent of the parties, evidenced by the bank's finance committee minutes predating the foreclosure sale and the timeframe of the proposed agreements, indicate a pre-existing agreement for the Brookwood partners to retain their economic interest. The foreclosure sale and resale to C, D & G, with the ultimate result that C, D & G reaquired the Brookwood property without the constraints of the limited partners but with sufficient operating capital to complete the project, is evidence that the same parties did retain the economic interest in the property. As the Ninth Circuit, affirming this Court, stated in *Hassen v. Commissioner*, 599 F.2d at 308:

If Pacific Thrift had not sold to U.L.C., none of this would be at issue. But it did in fact sell and U.L.C. is owned by the taxpayers; the [property] has passed indirectly from taxpayers to taxpayers' corporation. The mechanics of the transaction should not divert attention from the fact that taxpayers have not sustained any genuine loss in the asset.

The near-identity of terms between those proposed and those accepted, along with the bank's purchase of Brookwood for an amount below the previously agreed price after the limited partners were bought out, further indicate an indirect sale from Brookwood to C, D & G resulting in the realization of no genuine economic loss to petitioner.

Petitioner contends that his testimony regarding the bank's intention to sell for the highest offer is

uncontroverted. However, we are not bound to accept the self-serving testimony of an interested witness. *Archer v. Commissioner*, 227 F.2d 270 (5th Cir. 1955).[9] This is particularly true where, as here, the documentary evidence renders the testimony unbelievable.

We find the evidence of a proposed plan between the bank, Brookwood, and C, D & G is sufficient to rise to the standard of a prearrangement within the meaning of *McWilliams* and *Hassen*. Petitioner's loss, therefore, is properly disallowable under section 707(b)(1)(B) as a loss arising from the sale or exchange of property, directly or indirectly, between two partnerships in which the same persons owned, directly or indirectly, more than 50 percent of the capital and profits interest. We are not denying that a foreclosure sale took place, with title passing to the bank which for 1 month did operate the property. We are saying, however, that under the authority of *McWilliams* and *Hassen*, the parties did not realize a genuine economic loss and thus hold that petitioner's loss on the foreclosure sale should be disallowed.

Because we hold that petitioner's claimed loss on the foreclosure of the Brookwood apartments should be disallowed under section 707(b)(1)(B), we do not reach respondent's alternative argument that the foreclosure and resale were a sham in which no deductible economic loss was realized.

## Issue 3. Bad Debt

Petitioner contends that it is undisputed that amounts accrued by Brookwood as guaranteed payments under section 707(c) were included in his income for 1973 and 1974. Petitioner also contends these amounts were never paid to him, and that after Brookwood's foreclosure in 1975, these amounts could never be paid and thus were uncollectable.

---

[9]See also *Schroeder v. Commissioner*, T.C. Memo. 1986-467, a Memorandum Opinion of this Court (52 T.C.M. 623, 55 P-H Memo T.C. par. 86,467, at 2152 (1986)) in which we stated that—

"we are not required to accept testimony at face value, and we may discount a witness's self-interested testimony. *Archer v. Commissioner*, 227 F.2d 270 (5th Cir. 1955); *Weiss v. Commissioner*, 221 F.2d 153 (8th Cir. 1955). * * *"

The parties correctly identify the elements required to be shown before a taxpayer may take a section 166 business bad debt deduction. These include a valid debtor-creditor relationship, a debt created or acquired in connection with a trade or business, the amount of the debt, the worthlessness of the debt, and the year the debt became worthless. Respondent contends that petitioner has failed to prove any of these elements and therefore is not entitled to a bad debt deduction.

Section 166(a)(1) allows a deduction for any debt which becomes worthless in the taxable year. Section 1.166-1(c), Income Tax Regs., requires a bona fide debt, i.e., "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Further, section 1.166-1(e), Income Tax Regs., provides in pertinent part as follows:

(a) *Prior inclusion in income required.* Worthless debts arising from unpaid wages, salaries, fees, rents * * * shall not be allowed as a deduction under section 166 unless the income such items represent has been included in the return of income for the year for which the deduction as a bad debt is claimed or for a prior taxable year.

If we assume, as petitioner contends, that respondent's inclusion in petitioner's income of the amounts petitioner claimed as a bad debt deduction is sufficient to satisfy the regulation's requirement of prior inclusion in income, we nevertheless conclude that petitioner is not entitled to the bad debt deduction unless he satisfies the remaining prerequisites for such deduction.

Petitioner contends that the fact that a debt existed and the amount owed are established by respondent's adjustments to petitioner's income tax for the years 1973 and 1974. Petitioner argues that the debt which arose from the Brookwood operation is related to a trade or business, and further argues that a good-faith effort to collect the debt is an element to be considered in determining its worthlessness. Petitioner states the record is replete with evidence with respect to Brookwood's financial difficulty and ultimate demise, but he provides no evidence of a good faith attempt to collect the debt. Petitioner cites *Little v. Helvering*, 75 F.2d 436 (8th Cir. 1935), and *Heinemann & Co. v. Commissioner*, 40 B.T.A. 1090 (1939), for the

proposition that the foreclosure sale and the date of foreclosure establish worthlessness of the debt and the year of worthlessness.

We find both *Little* and *Heinemann* to be distinguishable because in each of those cases there were no other assets from which the party seeking the bad debt deduction could collect. This record totally fails to show why petitioner had not collected prior to the foreclosure. Also, there was another general partner in Brookwood, and partnership's liabilities become the general partners' liabilities.

Petitioner contends his testimony that he did not receive the money is sufficient proof of nonpayment. However, petitioner makes no showing of why he did not receive payment prior to August 1975. The record shows that during this period, some partnership debts were being paid. The partnership records might well show some disposition of the guaranteed payments to petitioner, which amounted either to payment to him of the amounts or his contribution of the amounts to the capital of the partnership.

With respect to respondent's contentions that petitioner should have produced written records of nonpayment, petitioner states that "there was no burden upon him to produce any writing when no contrary proof had been produced to this statement." However, the burden of proof with respect to the bad debt deduction is on petitioner. *Welch v. Helvering*, 290 U.S 111 (1933); Rule 142. As noted previously, we are not required to accept testimony at face value, but may discount a witness's self-serving testimony. Also, this Court has stated:

The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. * * * This is especially true where, as here, the party failing to produce the evidence has the burden of proof or the other party to the proceeding has established a prima facie case. * * * [*Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Citations omitted.]

In light of the above authorities where petitioner, who admittedly kept the records for Brookwood, provided no documentary evidence to establish nonpayment of the amounts in question, we are not bound to accept his

testimony as conclusive. This is particularly true where the records might show facts with respect to the handling of the items which would be tantamount to payment so that petitioner's testimony as to nonpayment might well be his legal conclusion. Petitioner has failed to prove that the debt was never paid.

Petitioner also contends that uncontradicted testimony in the record proves he had no special rights to the Brookwood property and thus the debt was worthless upon foreclosure. Again, this Court is not bound to accept petitioner's self-serving testimony. *Archer v. Commissioner, supra.* This argument ignores the clear import of the bank finance committee minutes and is contrary to our holding on the indirect sale issue. Further, even if it were true that petitioner had no rights in the property, that argument also ignores the operation of partnership law whereby the general partners assume liability for partnership debts. Assuming the foreclosure had been valid and the guaranteed payments were uncollectable from the partnership, petitioner has failed to show why he could not enforce at least a portion of the alleged debt against the other general partner of Brookwood. Petitioner has made no showing of any effort to collect from either the partnership or the other general partner.

Our conclusion that petitioner is not entitled to a bad debt deduction for the guaranteed payments is based on a number of reasons. These reasons include: the fact that petitioner provided no evidence of an attempt to collect from the partnership or from the general partners; the fact that petitioner did not produce the books of Brookwood to establish nonpayment of the alleged debt; and the fact that petitioner failed to prove that he did not treat the guaranteed payments in such a manner as to in effect make a contribution to the partnership capital.

*Decision will be entered under Rule 155.*