C. WAYNE LITCHFIELD AND JUDY S. LITCHFIELD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Litchfield v. Commissioner
Docket No. 11136-92
United States Tax Court
T.C. Memo 1994-585; 1994 Tax Ct. Memo LEXIS 596; 68 T.C.M. (CCH) 1291; December 1, 1994, Filed *596 Decision will be entered under Rule 155. C. Wayne Litchfield, pro se. For Judy S. Litchfield, petitioner: John E. Patterson, Jr. (specially recognized). For respondent: Bruce K. Meneely. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1985 in the amount of $ 34,924 and additions to tax as follows: Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661 $ 8,731
$ 2,134
[1]
$ 8,731
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the issues remaining for decision are: (1) Whether petitioners are entitled to deduct as a business bad debt from Xenerex Corporation the amount of $ 80,398 under section 166; [2] and, if not, (2) whether petitioners are liable for an *597 addition to tax for negligence under section 6653(a)(2) with respect to the portion of the underpayment attributable to the disallowance of the business bad debt deduction. *598 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners C. Wayne Litchfield (petitioner) and Judy S. Litchfield are husband and wife and, at the time the petition was filed in this case, resided in Oklahoma City, Oklahoma. Petitioners filed a joint Federal income tax return for the taxable year 1985. They utilized the cash method of accounting for 1985. During the year at issue, petitioner was a principal in the law firm of Ferguson & Litchfield. Petitioner reported his income from Ferguson & Litchfield on Schedule E as income from an S corporation. Ferguson & Litchfield began to perform legal services for L.G. Williams Oil Company, Inc. (Williams), in 1981. In July of 1981, Williams was acquired by Matrix Energy, Inc. (Matrix), a wholly owned subsidiary of Xenerex Corporation (Xenerex). Xenerex, a publicly traded company in 1985, was principally engaged in the exploration, development, operation, and marketing of oil and gas properties. Xenerex conducted its business primarily through two wholly owned subsidiaries, Matrix and Delta Gas Company, *599 Inc. (Delta). Ferguson & Litchfield continued to perform legal services for Matrix until September of 1985. In early 1983, Matrix owed Ferguson & Litchfield in excess of $ 277,000 for legal services rendered. In April of 1983, Ferguson & Litchfield settled a complex legal matter for Matrix arising out of a transaction with Oil Field Systems (OFS). As a result, $ 632,341.61 was transferred into the Ferguson & Litchfield trust account to be held in escrow; the escrowed funds were to be disbursed to Matrix after certain curative title matters were resolved. On May 10, 1983, all requirements had been met for disbursal to Matrix of approximately $ 474,000 from the escrowed funds. Petitioner informed James A. Myers (Myers), president of Xenerex, that $ 474,000 of the escrowed funds could be disbursed, but requested that Ferguson & Litchfield be permitted to retain $ 277,000 as payment of the legal fees owed by Matrix to the firm. Myers initially was unwilling to use any of the escrowed funds for the payment of the legal fees. Petitioner's partner, Ferguson, demanded that the legal fee be paid in full immediately. Ferguson wanted to withhold the escrow funds until payment of the *600 outstanding fee was agreed upon. However, after consultations with other attorneys, petitioner reached the conclusion that the professional ethics rules of Oklahoma would not allow the holding of moneys owed to a client as a device to collect a fee. After further negotiations, Myers agreed to pay $ 100,000 of the fee out of the escrowed funds. In an attempt to obtain additional cash for the law firm and to placate his law partner, petitioner proposed that he borrow $ 100,000 and lend that money to Xenerex. Xenerex would then use the $ 100,000 of borrowed funds plus $ 100,000 of the escrowed funds to pay Ferguson & Litchfield $ 200,000 of the fees owed. Myers did not accept this proposal. Myers did not want either company to undertake additional debt because Xenerex and Matrix were in the midst of converting debt into equity to improve their respective balance sheets. As an alternative, Myers suggested that Ferguson & Litchfield retain $ 200,000 from the escrowed funds and, in exchange for $ 100,000, Xenerex would issue to petitioner restricted shares of Xenerex stock, coupled with Xenerex's agreement to repurchase the stock within 120 days for $ 100,000. Petitioner was agreeable *601 to the stock purchase/repurchase arrangement. Myers and petitioner agreed that, in the event Xenerex did not repurchase the stock within the agreed 120 days, Xenerex would pay interest on the repurchase amount from the original date of purchase. In addition, they agreed that petitioner could assign the repurchase agreement to the bank from which petitioner would borrow the purchase price of the stock and that the bank would also have the right to enforce the repurchase agreement. On May 10, 1983, Myers prepared a memorandum outlining his understanding of the agreement: I reached the following agreement with Wayne Litchfield regarding the temporary handling of his fees as follows: 1) All parties expect the OFS funds [the escrowed funds] to be released today in the amount of $ 473,990.22. Of that amount, Wayne will wire transfer $ 273,990.22 to MEI [Matrix], retaining $ 200,000. 2) On or before Monday, May 16th, Wayne will purchase from the company 285,714 shares of Xenerex common at $ .35 per share, or a total of $ 100,000. 3) We will give Wayne the right to put these shares to MEI in 120 days at $ .35 per share or $ 100,000. It is our intention to have the shares included *602 in the S-14 registration [with the Securities and Exchange Commission (SEC)] and assuming the market is above $ .35 at that time, Wayne will obviously not exercise the put option. I have not agreed on the total amount of Wayne's fee as we have not received the detailed billing for the short period in April. Therefore, the final amount owed to Wayne's firm is not yet liquidated. 4) Depending on Wayne's ability to justify the $ 277,000, total billings of his firm, Wayne will continue to have a call on the $ 77,259.62 he will continue to hold in the OFS escrow fund pending release of suspended OFS [oil production] runs. 5) Based upon the above understanding, I called Steve Rothschild and gave him clearance to release the escrow funds. Steve felt certain it could be accomplished today in time to clear wire transfer.
The $ 273,990.22 was wire transferred to Matrix on May 10, 1983; the amount of $ 200,000 of the escrowed funds was retained by Ferguson & Litchfield as payment of their legal fees. In order to purchase the Xenerex stock, petitioner sought a loan from First City Bank, N.A. (First City Bank). On May 17, 1983, petitioner wrote a letter to the president of First City *603 Bank, explaining his agreement with Xenerex. Petitioner noted that Xenerex would be filing an S-14 registration statement with the SEC and that his shares would be included in the registration. He further wrote: Xenerex Corp. will agree that it will repurchase my Xenerex Corp. shares for $ 100,000 on demand 120 days after I acquire them. I need to go ahead and sign a note and trust receipt for the shares and then will go to Dallas and get the piggyback registration agreement and "put" documented before delivering a check in payment for the shares. The Rauscher Pierce Refsnes, Inc. representative in Dallas handling the account is Eddie Bloomfield. Rauscher Pierce is aggressively putting their customers into the stock. I know it is fantasy, but they are projecting a price of $ 1.00 when the registration becomes effective and a $ 3 to $ 5 stock within 12 to 18 months. Whether the stock does anything or not, it was a good business proposition for me to buy it, as my doing so accommodated Ferguson & Litchfield collecting an attorney's fee of $ 277,000. I may be Pollyannaish, but I believe that the Xenerex Corp. stock is a good speculation that will make a profit.
On May *604 20, 1983, petitioner borrowed $ 100,000 from First City Bank. The outstanding principal balance plus accrued interest was payable on demand, but not later than November 16, 1983. Petitioner pledged the Xenerex stock as collateral for the loan. The 285,714 shares of Xenerex stock were represented by three stock certificates, each of which was issued in petitioner's name. Each stock certificate bore the following restrictive legend pending completion of the company's registration with the SEC: The shares represented by this Certificate have not been registered under the Securities Act of 1933 ("the Act"), and are "restricted securities" as that terms [sic] is defined in Rule 144 under the Act. The shares may not be offered for sale, sold or otherwise transferred except pursuant to an effective registration statement under the Act, or pursuant to an exemption from registration under the Act, the availability of which is to be established to the satisfaction of the Company.
The stock certificates were to be delivered directly to First City Bank upon issuance, but were delivered instead directly to petitioner. On May 20, 1983, petitioner and Myers executed a document entitled *605 Agreement for Purchase and Agreement to Repurchase 285,714 Shares Xenerex Corp. Non-Par Common Voting Stock (the stock repurchase agreement), the terms of which are set forth below: Dear Jim [Myers]: Attached you will find First City Bank, N.A.'s Official Check Number 7159 payable to me for One Hundred Thousand Dollars ($ 100,000), that has been endorsed and made payable to the order of Xenerex Corp. for the purchase of Two Hundred Eighty-Five Thousand Seven Hundred Fourteen (285,714) shares of Xenerex Corp. Non-Par Common Voting Stock, and in consideration for my purchasing said stock, Xenerex Corp. has made the following covenants and agreements with me: 1. That the Xenerex Corp. shares, when issued, will represent fully paid, non-assessable Common Voting Stock; 2. Xenerex Corp. will, at my request, repurchase the Two Hundred Eighty-Five Thousand Seven Hundred Fourteen (285,714) shares of Xenerex Common Voting Stock I am purchasing for One Hundred Thousand Dollars ($ 100,000) in good funds, on September 19, 1983, upon my delivering the Certificates evidencing said shares to Xenerex Corp.'s office located at 2505 Southland Center, Dallas, Texas, 75201, endorsed for transfer; *606 3. Xenerex Corp. is preparing a Registration Statement for filing the with [sic] Securities & Exchange Commission that will include my Two Hundred Eighty-Five Thousand Seven Hundred Fourteen (285,714) shares of Xenerex stock, without cost to me, so that when said Registration Statement is effective the legends on my Stock will be removed and said shares will be "freely tradeable" on the open market in broker transactions; 4. Should Xenerex fail to honor my repurchase demand and fail to repurchase my Xenerex shares within five (5) days after September 19, 1983, Xenerex shall pay interest of twelve percent (12%) per annum on the One Hundred Thousand Dollar ($ 100,000) agreed purchase from the date hereof until said repurchase is completed, and further pay a reasonable attorneys fee of up to fifteen percent (15%) of the repurchase amount and accrued interest if any legal action is commenced against Xenerex Corp. to enforce this agreement. 5. Should Xenerex merge or consolidate with any other corporation, my Xenerex shares will, on any such merger or consolidation, be treated equally with all other Xenerex shares of the same class; 6. The issuance of the Two Hundred Eighty-Five *607 Thousand Seven Hundred Fourteen (285,714) shares of Xenerex Corp. Non-Par Common Voting Stock, and the execution of this Letter Agreement has [sic] been authorized and approved by the Board of Directors or the Executive Committee of the Board of Directors of Xenerex Corp.
On May 23, 1983, petitioner forwarded a copy of the stock repurchase agreement to Joseph W. Kell (Kell), vice president of First City Bank. Petitioner emphasized to Kell that Xenerex was preparing a registration statement that, when completed, would result in his shares' being freely tradeable. On June 10, 1983, petitioner mailed his Xenerex stock certificates to Kell and advised him that Xenerex had filed the registration statement with SEC the preceding day. At the end of the 120-day period, petitioner did not put the shares to Xenerex for repurchase. In a letter to Myers, dated September 12, 1983, petitioner indicated that he would accept an extension of the put date until November 10, 1983, if Xenerex would agree to pay interest at First City Bank's prime rate. A letter, dated September 20, 1983, confirms an agreement by petitioner and Myers to extend the put date until November 10, 1983, with interest *608 at First City Bank's prime rate from May 20, 1983, to November 10, 1983, or until the stock was purchased by Xenerex or sold to others. On November 4, 1983, petitioner wrote to Myers, asking for assistance in finding a purchaser for some of his Xenerex stock so that he could make a partial payment on his First City Bank note, which was coming due on November 16, 1983. On November 16, 1983, petitioner wrote to Kell of First City Bank as follows: Xenerex Corporation will repurchase the Xenerex Corporation stock on which you hold a Repurchase Agreement, or they will extend the Repurchase Agreement for ninety days until their Registration Statement becomes effective. The current price that could be realized on the stock would just about liquidate their take-out liability, but they suggest that they believe some dramatic things are going to happen within the next 90 - day period that would raise the market value of the stock to the $ .75 to $ 1.25 range. Rauscher Pierce Refsnes, Inc., is making a market in Dallas and Dillon Securities in Spokane, Washington, has started making a market on the west coast. I am told that Dillon Securities has purchased three million shares of the *609 stock at a price in the 35 [cent] range. If it is not uncomfortable to you in view of what appears to be positive developments, I would like to pay the interest on my note and get Xenerex Corporation to extend their take-out/put on the stock for ninety days and see if any of the good things they are proposing come about.
Kell agreed to extend the loan for 90 days and requested payment of the accrued interest in the amount of $ 6,463.19. Also on November 16, 1983, petitioner wrote to Myers advising him that the bank would extend petitioner's loan subject to Xenerex's extending its put for another 90-day term and agreeing to pay petitioner's interest on the First City Bank loan, until Xenerex purchased the stock or the stock was sold to others. On November 18, 1983, petitioner wrote to Myers, enclosing an extension of the stock repurchase agreement to February 10, 1984, for Myers' review and signature. Petitioner also sought reimbursement of his interest payment and assistance in selling the stock: I spoke with Terry Rand [senior vice president of Xenerex] about the matter, and he felt that the shares could be liquidated during this 90-day term. I have had to pay my interest *610 of $ 6,463.19 and would appreciate your reimbursing me that expense with an understanding that when, if the stock is sold to others, I will reimburse Xenerex Corporation for this expense if the stock sells for an amount sufficient to pay my then accrued interest plus $ 100,000.00.
In February of 1984, petitioner again agreed to further extend the put date under the Xenerex repurchase agreement to May 10, 1984, and First City Bank extended the due date of petitioner's loan to May 14, 1984. On February 10, 1984, petitioner wrote to Myers to inform him that the bank had extended the loan in order to accommodate an orderly sale of petitioner's Xenerex stock and to request that the restrictions be removed from the stock certificates. On February 16, 1984, petitioner wrote to Kell at First City Bank to inform him that: They [Xenerex] are having their Shareholders' Meeting today, and I am informed that after today we can send the certificates to the transfer agent and get them reissued without the restrictions. I will get the details on the mechanics so that this step can be made towards getting the shares marketable.
In a letter dated April 6, 1984, petitioner requested that *611 First City Bank send the three Xenerex restricted stock certificates to the company's transfer agent in order to have the restrictive legend removed. In that letter, petitioner stated that Xenerex had assured him that the stock would be sold before the due date on the loan. On April 17, 1984, the transfer agent issued to petitioner one new stock certificate with no restrictive legend, representing all 285,714 shares. In May of 1984, First City Bank again extended the due date of the loan to July 30, 1984, and petitioner and Xenerex again extended the put date under the repurchase agreement to August 10, 1984. On July 30, 1984, petitioner made a conditional demand on Xenerex to repurchase his stock as follows: For the record, my Note on the Xenerex Corporation stock is due again, and the Bank wants it to be paid. If the market will not accommodate a sale of the securities to pay the Note plus my interest of $ 16,478.78 within the next few days, please consider this my demand on Xenerex to repurchase the securities. I have my broker at Stifel, Nicolaus & Company monitoring the market closely to see when a sale of securities on the market will recoup my principal and interest *612 of $ 116,478.78. I have some flexibility at the Bank, and the fact that the registration became effective creates a new positive feature, but the Note does have to be paid this time around; and, if a sale of the securities on the market will not pay the note, I must and do hereby make demand on Xenerex Corporation to repurchase them.
However, neither petitioner nor First City Bank enforced the repurchase agreement at that time. First City Bank, instead, continued to extend the due date of the loan to September 30, 1984, then to November 1, 1984, and then to January 11, 1985. Petitioner and Xenerex again extended the put date under the repurchase agreement to September 30, 1984. In October of 1984, Xenerex finally received approval of its registration statement from the SEC and commenced a $ 10 million public offering of stock. On October 31, 1984, Xenerex itself assured First City Bank that it still considered its put obligation to be in effect and extended during the course of Xenerex's selling efforts on its public offering of stock. During October of 1984, petitioner purchased and then sold through his stockbroker an additional 200,000 shares of Xenerex stock. [3]
*613 In December of 1984, the board of directors and the shareholders of Xenerex approved a 1-for-20 reverse stock split. After the reverse stock split, petitioner's original 285,714 shares became 14,285 shares. By letter dated December 10, 1984, First City Bank formally demanded that Xenerex repurchase the stock. On December 12, 1984, petitioner sent his trust account check in the amount of $ 20,913.17 to First City Bank, representing a partial payment by Xenerex on its stock repurchase obligation. [4] As a result of the payment, the principal amount of the loan remaining was $ 80,397.94 with deferred interest due at maturity on January 11, 1985, in the amount of $ 2,338.79. Again in January of 1985, petitioner requested further extensions of the First City Bank loan while Xenerex completed its stock offering. The bank agreed to defer payment of the remaining balance of the loan until April 11, 1985. After repeated *614 90-day extensions, petitioner and Xenerex ultimately extended the put date under the stock repurchase agreement to March 7, 1985. In March of 1985, Myers informed petitioner that Xenerex was negotiating certain transactions with Southmark Corporation. Southmark Corporation was interested in the tax benefits it would receive from the large net operating losses of Xenerex and its subsidiaries. The proposed transactions with Southmark Corporation were subject to certain conditions, including (1) Xenerex's completion of the $ 10 million public offering, and (2) the exchange by Xenerex of at least $ 3.5 million of its current debt for Xenerex stock being sold in the public offering (the debt exchange). Petitioner agreed to participate in the debt exchange and, on March 7, 1985, he signed a Letter of Intent -- Debt Exchange document memorializing the agreement (the debt exchange agreement). The debt exchange agreement stated that Xenerex, Matrix, and/or related companies were indebted to petitioner in the amount of $ 104,597.46, plus interest at 15 percent from January 11, 1985. Conditional upon successful completion of the public offering and consummation of the Southmark Corporation *615 transactions, petitioner agreed to accept 20 percent of the amount of the debt in cash and 80 percent in stock to be issued by Xenerex in the public offering in full satisfaction and discharge of Xenerex's obligation to repurchase petitioner's stock. Petitioner reserved the right to withdraw from the debt exchange agreement if the debt exchange was not completed on or before April 15, 1985. During this time, First City Bank again agreed to defer petitioner's repayment of the balance of his loan to June 11, 1985. In mid June of 1985, First City Bank was declared to be insolvent, and the Federal Deposit Insurance Corporation (the FDIC) was appointed as its receiver. As a result of the bank's insolvency, the FDIC would not further extend the loan to petitioner. The FDIC filed a suit against petitioner, his partner, their respective wives, and Ferguson & Litchfield to collect on several loans made to them by First City Bank. Eventually, the suit was settled, and petitioner made his final payment to the bank in 1991 or 1992. Xenerex continued to pursue the public offering and a merger with Southmark Corporation until September of 1985. The public offering and the Southmark merger *616 transaction ultimately were not consummated. On September 16, 1985, Xenerex, Matrix, and Delta filed voluntary bankruptcy petitions under Chapter 11 of the Bankruptcy Code. Xenerex listed petitioner as a holder of its common stock as of October 15, 1985. Ferguson & Litchfield was listed as one of the 20 largest unsecured creditors of Xenerex. At the time Xenerex, Matrix, and Delta filed their bankruptcy petitions, petitioner had not withdrawn his debt exchange agreement to participate in the debt exchange. Petitioner filed a trade creditor's claim in the Bankruptcy Court for the amount of $ 104,597.46. In 1993, petitioner was paid $ 6,387.75, which was approximately 6 percent of his claim. [5]
On their 1985 tax return, *617 petitioners claimed a business bad debt deduction in the amount of $ 40,000 on the Schedule C for "C. Wayne Litchfield D/B/A C. Wayne Litchfield & Assoc." and reduced S corporation income from Ferguson & Litchfield reported on Schedule E by the amount of $ 40,398. Attached to that return was the following statement: The taxpayer in 1983, in order to collect attorney fees for Ferguson & Litchfield, borrowed $ 100,000 from First City Bank and loaned this money to Xenerex Corp.Xenerex paid the $ 100,000 to Ferguson & Litchfield and put up Xenerex stock as collateral. This income was reported on taxpayer's 1983 tax return by K-1 from Ferguson & Litchfield. In 1984, Xenerex made a $ 20,000 payment on the note. In 1985, Xenerex went bankrupt, and the $ 80,397.94 is being reported as $ 40,397.94 reduction of income from Sub S, see part III Schedule E, and $ 40,000 as business bad debt shown on Schedule C. The taxpayer was liable for the debt, not the Sub S Corporation.
On February 28, 1992, respondent issued petitioners a notice of deficiency, disallowing the $ 40,000 business bad debt deduction petitioners claimed on Schedule C and the $ 40,398 reduction of S corporation income *618 claimed on Schedule E. Respondent determined that petitioners' loss was allowable as a long-term capital loss under section 165. [6]
OPINION I. Business Bad Debt Deduction
Petitioner claims that he made a loan of $ 100,000 to Xenerex that became worthless in 1985. Section 166 governs deductions for bad debts, other than a debt evidenced by a corporate or Government security. [7] Section 166(a)(1) provides that a deduction shall be allowed for any debt that becomes worthless within the taxable year. However, for an individual taxpayer, such *619 as petitioner, only business bad debts are accorded treatment as deductions against ordinary income. Sec. 166(d)(1)(A). If a nonbusiness debt becomes worthless within the taxable year, the loss from such debt is treated as a short-term capital loss. Sec. 166(d)(1)(B). Thus, there are two levels of inquiry that must be addressed in the bad debt deduction context: (1) Is there a bona fide debt, and (2) does the bona fide debt constitute a business or nonbusiness debt. We need not reach the second level of inquiry here because we hold that petitioner did not enter into a bona fide debt arrangement with Xenerex. Petitioner simply purchased stock from Xenerex, and the loss from the worthlessness of that stock is governed by section 165(g). Section *620 1.166-1(c), Income Tax Regs., defines bona fide debt as: a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * A gift or contribution to capital shall not be considered a debt for purposes of section 166. * * *
Thus, section 166 will apply only if (1) there is a valid and enforceable obligation to pay a fixed or determinable sum of money, (2) the obligation is based on a debtor-creditor relationship, and (3) the transaction is not a gift or contribution to capital or other form of equity investment. The existence of a bona fide debt is a factual inquiry that turns on the facts and circumstances of the particular case, and the taxpayer bears the burden of proving that a bona fide debt existed. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). Courts have identified and considered various factors in determining whether a bona fide debt exists. In re Uneco, Inc., 532 F.2d 1204, 1207-1208 (8th Cir. 1976) (10 factors); Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972) *621 (13 factors); In re Indian Lake Estates, Inc., 448 F.2d 574, 578-579 (5th Cir. 1971) (13 factors); Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (3d Cir. 1968) (16 factors).[8] Each unique fact situation dictates the relevancy and significance of the various factors. The Supreme Court recognizes that: There is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts.
John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946). This Court considers the ultimate question to be "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). *622 Petitioner argues that Xenerex's obligation to repurchase petitioner's Xenerex stock represents a bona fide debt within the meaning of section 166. Asserting that the written evidence of the debt appears in the form of the stock certificates and Xenerex's agreement to repurchase that stock, petitioner claims that all of the elements of a debt (written evidence of indebtedness, reasonably fixed maturity date, provisions for interest payments, and a demand for repayment) were present in the transaction between petitioner and Xenerex. Citing McNeil v. Commissioner, 251 F.2d 863 (4th Cir. 1958), petitioner argues that the true nature of the transfer rather than the form is controlling in determining whether a deductible bad debt loss has been sustained. Petitioner contends that he lent Xenerex $ 100,000 and that Xenerex selected an unorthodox form of documentation for the loan (stock certificates and a stock repurchase agreement), but treated the obligation to petitioner as a debt. We disagree. For a taxpayer to avoid the form of a transaction requires strong proof in this Court. Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), *623 vacating and remanding 44 T.C 549 (1965). The taxpayer must present "strong proof", that is, more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties. Elrod v. Commissioner, 87 T.C. 1046, 1066 (1986); Pritchett v. Commissioner, 63 T.C. 149, 171 (1974) (citing Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957)). In this case, however, the Court would reach the same result even if the standard required only a preponderance of the evidence. In determining whether a true debtor-creditor relationship arises upon the execution of a promissory note, we find it necessary to recognize the basic difference between a "stockholder" and a "creditor": The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend *624 to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. * * *
Baker Commodities, Inc. v. Commissioner, 48 T.C. 374, 395 (1967), affd. 415 F.2d 519 (9th Cir. 1969) (quoting Kolkey v. Commissioner, 27 T.C. 37, 58 (1956), affd. 254 F.2d 51 (7th Cir. 1958)). In this case, there is no promissory note so the question of the form of a promissory note does not even exist. More importantly, Myers of Xenerex expressly stated his intention not to enter into a debtor-creditor relationship with petitioner. Meyers did not want any more debt on the books of either Xenerex or Matrix, and he was actively engaged in converting their debt into stock. The stock repurchase agreement represents a protective hedge for petitioner's speculative investment in the corporation. Petitioner entered into an arrangement in which he seemingly could not lose. Xenerex would repurchase petitioner's stock for his original purchase price at the end of the 120-day period, or the restrictions on the stock would be removed in the *625 completed registration and petitioner would be free to sell the shares on the open market at the anticipated higher price. Petitioner himself, in numerous communications, referred to his stock as a "good speculation that will make a profit" and that "dramatic things are going to happen * * * that would raise the market value of the stock." Petitioner's loss came as a result of petitioner's failure to enforce the stock repurchase agreement prior to the stock's becoming worthless. The record clearly shows that petitioner held a capital asset, not a debt instrument. Although the stock initially contained restrictions to resale, petitioner was the owner of record from the time of issuance of the stock. Throughout the loan deferral period for the loan between petitioner and First City Bank, petitioner represented to First City Bank that he owned the Xenerex stock and that he believed that the stock would increase in value. Petitioner's Xenerex stock was pledged as collateral for petitioner's loan from First City Bank. Perhaps most telling of all is petitioner's November 16, 1983, letter to Kell of First City Bank in which petitioner states: Xenerex Corporation will repurchase *626 the Xenerex Corporation stock on which you hold a Repurchase Agreement, or they will extend the Repurchase Agreement for ninety days until their Registration Statement becomes effective. The current price that could be realized on the stock would just about liquidate their take-out liability, but they suggest that they believe some dramatic things are going to happen within the next 90-day period that would raise the market value of the stock to the $ .75 to $ 1.25 range. * * * I am told that Dillon Securities has purchased three million shares of the stock at a price in the 35 [cent] range. If it is not uncomfortable to you in view of what appears to be positive developments, I would like to pay the interest on my note and get Xenerex Corporation to extend their take-out/put on the stock for ninety days and see if any of the good things they are proposing come about.
We think that, if petitioner were approaching this transaction as a true creditor rather than as a speculator, he would have liquidated the stock for the $ .35 per share on the original put date. Instead, he gambled that the price of the stock would double or triple and later was unable to recoup his initial *627 investment. Although, in his letter of July 30, 1984, petitioner conditionally demanded that Xenerex repurchase the stock "if the market will not accommodate a sale of the securities to pay the Note [to First City Bank] plus my interest within the next few days * * *", he subsequently continued to extend the put date of the stock for another year thereafter. Many letters and documents in the record reflect the speculative nature of petitioner's investment in Xenerex. The initial agreement between Xenerex and petitioner indicates the anticipation that the stock would become freely tradeable within the 120 days of the agreement and would be trading at a price higher than $ .35 a share. The fact that this result did not come to pass does not change the true substance of the transaction -- petitioner's speculative investment in the corporation. The fact that petitioner may have also been motivated by a desire to appease his law partner and retain a large client does not negate his "intention * * * to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he * * * [might] enjoy the chances of profit". Baker Commodities, Inc. v. Commissioner, 48 T.C. at 395. *628 Furthermore, we do not think that Xenerex's failure to repurchase petitioner's stock under the repurchase agreement gives rise to a bad debt deduction under section 166. In Lewellyn v. Electric Reduction Co., 275 U.S. 243 (1927), the Supreme Court held that where a seller breached an executory contract after the buyer had prepaid the purchase price for merchandise, the buyer's right under the agreement was not a "debt" in either the technical or the colloquial sense for purposes of the predecessor of section 166. In such a case, the buyer simply possesses the usual remedies for breach of contract. Such remedies, without more, do not elevate the status of a contractual promisee to that of a creditor. Accordingly, the buyer was not entitled to a bad debt deduction for the unshipped merchandise. [9]
*629 Based upon all of the evidence of record in this case, we conclude that petitioner's relationship with Xenerex cannot be characterized as a bona fide debtor-creditor relationship and that neither the stock certificates nor the stock repurchase agreement represent evidence of a bona fide debt. Therefore, petitioner is not entitled to a bad debt deduction under section 166 for the taxable year 1985, but he is entitled to a long-term capital loss for worthless stock under section 165(g), as allowed by respondent. [10]
II. Negligence
If any part of any underpayment *630 is due to negligence, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the entire underpayment. Petitioners concede that they are liable for the addition to tax under section 6653(a)(1) and (2) with respect to the underpayment attributable to various conceded items. See supra note 1. Therefore, petitioners are liable for the addition to tax under section 6653(a)(1) with respect to the entire underpayment, including the portion attributable to the disallowance of the claimed bad debt deduction. For taxable year 1985, section 6653(a)(2) provides for a separate addition to tax equal to 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence or intentional disregard of the rules or regulations. The issue is whether that portion of the underpayment attributable to the claimed bad debt deduction is attributable to negligence or intentional disregard. Negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence *631 is presumed correct, and petitioners bear the burden of proving otherwise. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). After First City Bank formally demanded that Xenerex repurchase the stock in December of 1984, petitioner sent the bank $ 20,913.17 that he had withdrawn from the escrowed funds and that represented a partial payment by Xenerex on its stock repurchase obligation. Then in March of 1985, petitioner agreed to exchange Xenerex's remaining obligation to repurchase his stock, stated to be $ 104,597.46, for 20 percent cash and 80 percent in new stock issue. This figure of $ 104,597.46 was also used in petitioner's various claims in the Xenerex/Matrix bankruptcy proceeding. Petitioner has treated the transaction inconsistently, seemingly always characterizing it in a manner most favorable to his purpose at the time. Petitioner attached the following statement to his 1985 Federal income tax return: The taxpayer in 1983, in order to collect attorney fees for Ferguson & Litchfield, borrowed $ 100,000 from First City Bank and loaned this money to Xenerex Corp.Xenerex paid the $ 100,000 to Ferguson & Litchfield and put up Xenerex stock *632 as collateral. This income was reported on taxpayer's 1983 tax return by K-1 from Ferguson & Litchfield. In 1984, Xenerex made a $ 20,000 payment on the note. In 1985, Xenerex went bankrupt, and the $ 80,397.94 is being reported as $ 40,397.94 reduction of income from Sub S, see part III Schedule E, and $ 40,000 as business bad debt shown on Schedule C. The taxpayer was liable for the debt, not the Sub S Corporation.
This description of the transaction does not comport with what really happened. Petitioner offered no reason for splitting the claimed deduction between his Schedule C and Schedule E. However, the facts in this case are complex and no doubt were difficult to sort out back in 1985 in the midst of the FDIC's takeover of First City Bank and the Xenerex/Matrix bankruptcy filing, matters that were not fully resolved until 1991, 1992, and 1993. Petitioner conservatively claimed the lesser amount of $ 80,397.94 rather than the $ 104,597.46 as the bad debt deduction on his tax return. While the Court has rejected his characterization of the Xenerex transaction as a bad debt, we do not think he was negligent or disregarded rules or regulations in advancing the claim. *633 The record as fully developed at trial simply did not support his claim. Based on the evidence in this case, we hold that the portion of the underpayment attributable to the bad debt deduction is not subject to the addition to tax under section 6653(a)(2). Based upon the concessions and the foregoing holdings, Decision will be entered under Rule 155. Footnotes
1. Amount equal to 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment attributable to negligence or intentional disregard of the rules or regulations.↩
1. Petitioners have made the following concessions: They are not entitled to deduct expenses of $ 14,390 paid on behalf of their subchapter S corporation, ComCor, Ltd.; they are not entitled to deduct interest in the amount of $ 4,760, as claimed on Schedule A; they are liable for self-employment tax to the extent they realized a net profit on Schedule C; they are liable for the addition to tax under sec. 6651(a)(1); they are liable for the additions to tax under sec. 6653(a)(1) and (2) with respect to the above adjustments of $ 14,390 and $ 4,760; and they are liable for the addition to tax under sec. 6661. In addition, respondent determined in the notice of deficiency that petitioners failed to report gain in the amount of $ 1,451 on the sale of stock, which adjustment was not contested by petitioners and is deemed to be conceded. Rule 34(b)(4).↩
2. On their 1985 tax return, petitioners claimed a business bad debt deduction in the amount of $ 40,000 on the Schedule C for "C. Wayne Litchfield D/B/A C. Wayne Litchfield & Assoc." and reduced S corporation income from the law firm of Ferguson & Litchfield by the amount of $ 40,398 on Schedule E. In the notice of deficiency, respondent disallowed these items and determined that petitioners' loss was allowable only as a long-term capital loss under sec. 165.↩
3. Petitioner purchased 100,000 shares of Xenerex stock on Oct. 11, 1984, and 100,000 shares on Oct. 15, 1984, for a total of $ 25,502. Petitioner sold 20,000 shares on Oct. 26, 1984, 80,000 shares on Oct. 29, 1984, and 100,000 shares on Oct. 30, 1984, for a total of $ 13,437.50. At trial petitioner professed not to remember why he engaged in these trades in Xenerex stock.↩
4. This money was withdrawn from the escrowed funds held in Ferguson & Litchfield's trust account.↩
5. This claim of $ 104,597.46 was the figure contained in the debt exchange agreement whereby petitioner was to receive 20 percent cash and 80 percent stock. Petitioner's claim in the bankruptcy proceeding was separate and apart from the claim made by Ferguson & Litchfield in that bankruptcy.↩
6. Petitioners claimed a long-term capital loss of $ 375 on their 1985 return, and respondent allowed an additional capital loss of $ 2,625 in the notice of deficiency in lieu of the business bad debt deduction claimed by petitioners. In an amendment to answer respondent raised the new issue of whether the debt/equity investment became worthless in 1985. Respondent concedes on brief that the evidence in the record establishes that the investment became worthless in 1985.↩
7. For purposes of sec. 166, a security means a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form. Secs. 166(e), 165(g)(2)(C).↩
8. The following objective factors are most often applied: (1) Whether the corporation was grossly undercapitalized so that the loan in fact was needed for capital purposes and was intended to be risked capital rather than a loan; (2) whether the purported loan was made in proportion to equity holdings; (3) whether repayment of the loan was predicated on the success of the venture; (4) whether there was a fixed date for payment of the note and a reasonable expectation of payment on that date; (5) whether the note was subordinated to other corporate debts; (6) whether third parties would have made the loan under the same conditions; (7) whether the claimed loan was secured by a mortgage or otherwise; (8) whether a provision was made for a sinking fund to retire the loan; (9) whether the person making the purported loan participated in the management of the corporation; and (10) whether the corporation had a large proportion of debt to equity. In re Uneco, Inc., 532 F.2d 1204, 1208↩ (8th Cir. 1976). These various factors are usually applied in the context of a shareholder and his closely held corporation and may be less relevant in the case of a publicly held corporation such as Xenerex.
9. For purposes of that opinion, the Supreme Court assumed that a deduction for a bad debt under the predecessor of sec. 166 was mutually exclusive with a deduction for a "loss" under the predecessor of sec. 165. Lewellyn v. Electric Reduction Co., 275 U.S. 243, 246 (1927). It is now well established that secs. 165 and 166 are mutually exclusive, and that a bad debt is deductible as such under sec. 166 or not at all. Putnam v. Commissioner, 352 U.S. 82 (1956); Spring City Foundry Co. v. Commissioner, 292 U.S. 182↩ (1934).
10. Sec. 165(a) provides for a deduction of any loss sustained during the taxable year that is not compensated for by insurance or otherwise. Sec. 165(g) allows a deduction for any security that is a capital asset and that becomes worthless during the taxable year. The loss resulting therefrom is treated as a loss from the sale or exchange of a capital asset. Sec. 165(g)(1). The term "security" includes shares of corporate stock. Sec. 165(g)(2)(A).↩